**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)**

In re:

ALTUS PHARMACEUTICALS INC.,

        Debtor.

Chapter 7
Case No. 09-20886-WCH

**MOTION OF CHAPTER 7 TRUSTEE FOR ENTRY OF: (I) AN ORDER (A)
APPROVING BID PROCEDURES; (B) AUTHORIZING AND SCHEDULING AN
AUCTION; (C) APPROVING PAYMENT OF AN EXPENSE REIMBURSEMENT; (D)
ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN AGREEMENTS, INCLUDING NOTICE OF PROPOSED
CURE AMOUNTS; (E) ESTABLISHING A LIEN BAR DATE AND APPROVING
NOTICE THEREOF; AND (F) SCHEDULING A SALE HEARING; AND (II) AN
ORDER AUTHORIZING AND APPROVING: (A) THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS AND ENCUMBRANCES; AND (B) THE ASSUMPTION AND
<u>ASSIGNMENT OF CERTAIN AGREEMENTS IN CONNECTION THEREWITH</u>**

Lynne F. Riley, the duly appointed Chapter 7 Trustee in the above-captioned

proceeding (the "Trustee"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of

the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 6004, 6006 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and MLBR

2002-1, 2002-5 and 6004-1, respectfully requests entry of:

    (i)      an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "Bidding

              Procedures Order") (a) approving certain bid procedures, which are attached as

              <u>Exhibit 1</u> to the Bidding Procedures Order (the "Bid Procedures"), in connection

              with the sale of substantially all of the assets (the "Assets") of Altus

              Pharmaceuticals Inc., the above-captioned debtor (the "Debtor"), excluding

              avoidance actions and certain other claims and assets of the Debtor, all as

identified in that certain Asset Purchase Agreement (the "Purchase Agreement")

dated as of February 10, 2010 between Milk 401 Partners, LLC, a Massachusetts

limited liability company (the "Stalking Horse Purchaser") and the Trustee, a

copy of which is attached hereto as <u>Exhibit B</u> (the sale of such assets to the

Stalking Horse Purchaser or other successful bidder(s) being referred to herein as

the "Sale"); (b) authorizing and scheduling an auction in connection with the Sale

(the "Auction"); (c) approving the reimbursement of the Stalking Horse

Purchaser's documented out-of-pocket expenses not to exceed $30,000 (the

"Expense Reimbursement") in accordance with the terms and conditions of the

Purchase Agreement; (d) establishing and approving the procedures to determine,

and the form and manner of notice with respect to, the amounts to be paid and

actions to be taken to cure defaults, if any, under the contracts and leases

including without limitation intellectual property licenses (the "Contracts") to be

assumed by the Trustee and assigned to the successful bidder(s) in connection

with the Sale; (e) establishing a deadline (the "Lien Bar Date") for any party

asserting liens, claims or encumbrances with regard to any of the Assets to file a

statement of claim asserting the amount of the claim and basis for such lien claim

and approving notice thereof; (f) approving the form and manner of notice of the

proposed Sale, the Bid Procedures, the Lien Bar Date, the Auction and the sale

hearing(s); and (g) scheduling a hearing or hearings to consider approval of the

Sale; and

(ii)    an order, substantially in the form attached hereto as <u>Exhibit C</u> (the "Sale Order")

authorizing and approving (a) the sale of the Assets to the Stalking Horse

2

Purchaser, or the person(s) or entity(ies) making an otherwise higher and better offer at the Auction for the purchase of the Assets in the aggregate or by purchase of certain of the Assets in individual lots (collectively, the "Lots" and each, a "Lot"), free and clear of liens, claims and encumbrances; (b) the assumption and assignment of the Contracts in connection with the Sale; (c) approving the sublicensing of certain intellectual property licenses offered as a part of the Sale, if any; and (d) waiving the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d).

The facts and circumstances supporting the entry of the Bidding Procedures Order and the Sale Order sought by this Motion are set forth in detail below.  In further support of this Motion, the Trustee respectfully states as follows:

## **INTRODUCTION**

1.  On November 11, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

2.  The Trustee was appointed on November 12, 2009.

3.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.  The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014 and MLBR 2002-1, 2002-5 and 6004-1.

**BACKGROUND**

5.      The Debtor developed oral and injectable protein therapeutics.  As of the Petition

Date, its assets were comprised primarily of its intellectual property, consisting of patents,

licenses and other related intangible assets, and records relating to its product candidates and a

small amount of inventory and equipment.

**RELIEF REQUESTED**

6.      By this Motion, the Trustee respectfully requests entry of the Bidding Procedures

Order in substantially the form attached hereto as Exhibit A: (a) approving Bid Procedures in

connection with the Sale; (b) authorizing and scheduling the Auction; (c) approving the payment

of the Expense Reimbursement to the Stalking Horse Purchaser in accordance with the terms and

conditions of the Purchase Agreement; (d) establishing and approving the procedures to

determine, and the form and manner of notice with respect to, the amounts to be paid and actions

to be taken to cure defaults, if any, under the Contracts to be assumed and assigned to the

successful bidder(s) in connection with the Sale; (e) establishing the Lien Bar Date and notice

thereof; (f) approving the form and manner of notice of the proposed Sale, Bid Procedures,

Auction and Sale Hearing; and (g) scheduling the Sale Hearing.

7.      Following the Auction and at the Sale Hearing, the Debtor will seek entry of a

Sale Order approving: (a) the sale of the Assets free and clear of all Encumbrances (as defined

herein) to the Stalking Horse Purchaser or the person(s) or entity(ies) making an otherwise

higher and better offer at the Auction; (b) the assumption and assignment of the Contracts in

connection with the Sale; (c) approving the sublicensing of certain intellectual property licenses

offered as a part of the Sale, if any; and (d) waiving the fourteen (14) day stays under

Bankruptcy Rules 6004(h) and 6006(d).

A.     *The Proposed Sale*

8.      Former executives of the Debtor have informed the Trustee that the Debtor

engaged in a process of considering potential sales and restructuring alternatives to develop a

plan that would maximize value for the Debtor's stakeholders and to ensure the Debtor's long-

term survival.  After carefully considering its options and failing to raise adequate additional

capital, and in light of its liquidity constraints and financial deadlines and restrictions, the Debtor

determined that the best course of action to obtain the greatest possible return for its stakeholders

was to seek a buyer for the entirety of the Debtor's business as a going concern and evaluate the

potential sale of the Debtor's various assets separately.  The Debtor was unable to identify a

buyer for all of its assets within the time established by the Debtor after negotiations with a

stalking horse purchaser failed.  After the commencement of this proceeding, arms' length

negotiations between the Trustee and the Stalking Horse Purchaser resulted in the execution of

the Purchase Agreement for the purchase of the Assets by the Stalking Horse Purchaser.  The

Debtor has provided the Trustee with a list of prospective purchasers, many of whom engaged in

some discussions with the Debtor regarding purchasing assets of the Debtor.  The Trustee and

her representatives have also been contacted by a number of parties expressing interest in

acquiring some or all of the Debtor's assets.

9.      The Trustee believes that the floor established by the Purchase Agreement, subject

to higher and better bids pursuant to a Bankruptcy Court-approved auction process pursuant to

section 363 of the Bankruptcy Code affords the Trustee with the best opportunity to maximize

value for the Debtor's creditors and its estate with respect to the Assets under the circumstances.

10.      In addition, the Trustee has identified seventeen (17) individual Lots of Assets

with respect to which she proposes to seek bids.  The Trustee proposes to solicit bids for

individual Lots, any combination of Lots and substantially all Assets.  The proposed Lots of

Assets are described in Exhibit A to the proposed Notice of Auction and Sale and Lien Bar Date

(as that term is defined below).

**B.**    ***The Purchase Agreement***

11.    On February 10, 2010, the Trustee and the Stalking Horse Purchaser entered into

the Purchase Agreement pursuant to which the Stalking Horse Purchaser will acquire all of the

Assets and assume certain liabilities of the Debtor, as more fully set forth in the Purchase

Agreement.  The Assets are more particularly defined and described in the Purchase Agreement.

The Cash Consideration (as that term is defined in the Purchase Agreement) agreed to be paid by

the Stalking Horse Purchaser for the Assets is $400,000.  The Stalking Horse Purchaser shall

satisfy any outstanding cure amounts, as may be determined by the parties or the Bankruptcy

Court, with respect to the Contracts, provided that the Stalking Horse Purchaser may elect not to

close the transactions contemplated by the Purchase Agreement if such cure amounts are in

excess of $20,000 unless such excess amount is paid by the Trustee from assets of the Debtor in

her sole discretion.  The Trustee does not believe that any substantial cure amounts will be

required to be paid at Closing (as that term is defined in the Purchase Agreement).

12.    Immediately prior to the Petition Date, the Debtor was in active discussion with

several parties interested in the Debtor's assets.  The Trustee intends to continue to aggressively

solicit potential purchasers for the Debtor's business and assets in accordance with the Bid

Procedures and the Purchase Agreement.  The Trustee intends to execute her plan of pursuing the

sale of the Debtor's assets as promptly as practicable, in accordance with the provisions of the

Bankruptcy Code and in a manner that will afford all of the Debtor's economic stakeholders an

opportunity to participate in the process and otherwise maximize the value of the Debtor's assets for the benefit of all creditors.

13.     The Trustee seeks an expeditious, yet appropriate, schedule whereby the Sale Hearing may be held and completed within a period of approximately forty five (45) days from the date of entry of the Bidding Procedures Order.  The Trustee seeks to balance the expense of "annuity payments" required to maintain the patent portfolio of the Debtor with allowing sufficient time for parties to conduct diligence and bid for the Assets.

**C.     *Proposed Bid Procedures – MLBR 6004-1 Disclosures***

14.     The Trustee believes that it is important that she promptly move forward with the approval and implementation of the Bid Procedures to establish the procedures for further marketing of the Debtor's assets and competitive bidding.  Accordingly, the Bid Procedures (as summarized below) were developed consistent with the Trustee's need for a 30 to 45 day sale process, but with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Debtor's assets.  Moreover, the Bid Procedures reflect the Trustee's objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Debtor's assets by financially-capable, motivated bidders who are likely to close a transaction.

15.     The following paragraphs in this section summarize the key provisions of the Bid Procedures as proposed by the Trustee, and are qualified in their entirety by reference to the actual Bid Procedures attached as Exhibit 1 to the Bidding Procedures Order as may be entered by the Court.

## BID PROCEDURES

### Bidding Process

The Trustee will:

      (a)      provide notice as contemplated in the Bidding Procedures Order;

      (b)      determine whether any person is a Qualified Bidder (as defined below);

      (c)      determine whether a Qualified Bidder has made a Qualified Bid (as defined below); and

      (d)      negotiate any offer set forth in a Qualified Bid in conformity with the procedures set forth below,

(collectively, the "Bidding Process").

### Participation Requirements

Unless otherwise ordered by the Bankruptcy Court, in order to participate in the Bidding Process, each person or entity other than the Stalking Horse Purchaser (such person or entity, a "Potential Bidder") must first deliver to: (i) Lynne F. Riley, Esq., Altman Riley Esher LLP, 100 Franklin Street, Boston, MA 02110 (the "Trustee") and (ii) special counsel to the Trustee, Christopher J. Panos, Esq., Craig and Macauley Professional Corporation, Federal Reserve Plaza, 600 Atlantic Avenue, Boston, MA 02210, panos@craigmacauley.com and krahbany@craigmacauley.com (collectively, the "Notice Parties") the following items (the "Participation Requirements"):

      (e)      <u>Confidentiality Agreement</u>: An executed confidentiality agreement (unless previously delivered) in form and substance reasonably acceptable to the Trustee; and

      (f)      <u>Proof of Financial Ability to Perform</u>: The most current audited and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of making a Bid, the current audited and latest unaudited financial statements of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the proposed sale transaction, the sufficiency of which shall be determined by the Trustee in her discretion.  The Trustee may use her reasonable discretion to accept or require other information demonstrating financial ability.

## Access to Due Diligence Materials

Upon a Potential Bidder's satisfaction of the Participation Requirements such Potential Bidder shall be deemed a "Qualified Bidder."  The Trustee shall afford each Qualified Bidder due diligence access to the Debtor's assets, which diligence may include access to a data room and such other diligence which Potential Bidders may request and to which the Trustee, in her discretion, may agree, provided, however, that the Trustee shall have no obligation to provide due diligence access to any Qualified Bidder after the Bid Deadline (as defined below).  The Trustee may condition access to certain records in storage or other diligence information on payment by Potential Bidders of any related expenses.

## Bid Deadline

The deadline for submitting bids for the Assets by a Qualified Bidder so as to be received by the Notice Parties shall be _____, 2010 at 11:00 a.m. (prevailing Boston, Massachusetts time) (the "Bid Deadline").  A bid received after the Bid Deadline shall not constitute a Qualified Bid (as defined below).  The Trustee may extend the Bid Deadline.

No later than the Bid Deadline, a Qualified Bidder that desires to make an offer to acquire any of the Assets (a "Bid") shall deliver written copies of its Bid to the Notice Parties so as to be received by the Bid Deadline.

## Determination of Qualified Bid Status

To be eligible to participate in the bidding process each prospective Qualified Bidder must deliver a written Bid to the Notice Parties so to be received by the applicable Bid Deadline, and that complies with each of the following conditions unless otherwise agreed by the Trustee:

Marked Purchase Agreement: With respect to the Assets, a Bid shall be in the form of a black-lined copy of the Purchase Agreement showing the changes requested by the Bidder, including those related to the Purchase Price (as that term is defined therein), the assets to be purchased and other material terms such that the Trustee in her reasonable exercise of her business judgment may determine how such Bid compares to the terms of the Purchase Agreement.  The Bidder shall also deliver an executed "clean" copy of such Purchase Agreement, which shall be binding as provided herein.

Assets: The Trustee is considering Bids for the Assets in individual Lots, any combination of Lots, and substantially all Assets, as so provided in the Purchase Agreement.  Prospective Qualified Bidders may submit a "joint bid" for the Assets, provided, however, that the identity of each person participating in such "joint bid" must be disclosed in the Bid, and such "joint bid" shall be subject to section 363(n) of the Bankruptcy Code.  The Trustee may require that any "joint bid" shall contain separate consideration for each Lot bid upon and a separate purchase agreement for each Lot bid upon.

Conditions/Contingencies: A Bid shall NOT be subject to material conditions or contingencies to closing, including without limitation obtaining financing, internal approvals or

9

further due diligence; provided, however, a Bid may contain closing conditions set forth in the Purchase Agreement.  A bid may contain contingencies regarding licensing or sublicensing of Intellectual Property.

Authorization: A Bid shall include evidence of authorization and approval from such Qualified Bidder's board of directors or governing body with respect to the submission, execution, delivery and closing.

Good Faith Deposit: Each Bid shall be accompanied by a good faith deposit ("Good Faith Deposit") in the amount of the greater of $40,000 or 10% of the cash consideration in each Bid, which amount shall be increased to at least 10% of the purchase price accepted at the Auction, in the form of a certified check or other form acceptable to the Trustee in her discretion.  Each Good Faith Deposit will be deposited and held in escrow by the Trustee or her counsel.

Minimum Bid Requirement for Assets: Each Qualified Bidder's Bid to acquire substantially all of the Assets shall have an initial minimum bid requirement equal to the sum of: (i) the Purchase Price, (ii) the maximum Expense Reimbursement ($30,000) plus (iii) $25,000, or a total of $455,000.

Minimum Bid Requirement for Lots:  Each Qualified Bidder's Bid to acquire an individual Lot or combination of Lots shall have an initial minimum bid requirement equal to $50,000 for each Lot included in the Bid.

Other Evidence: Each Bid must contain evidence satisfactory to the Trustee in her discretion that the bidder is reasonably likely (based upon availability of financing, experience and other considerations) to timely consummate a sale transaction if selected as the Successful Bidder (as defined below).

Irrevocable: A Bid must be irrevocable until two (2) business days after the closing of the sale or sales pursuant to an order of the Bankruptcy Court that is no longer subject to appeal, modification or reconsideration.

A Bid received from a Qualified Bidder on or before the applicable Bid Deadline that meets the above requirements, in the Trustee's discretion, shall constitute a "Qualified Bid."  In the event that a Bid is determined not to be a Qualified Bid, such Bidder shall be refunded its Good Faith Deposit within three (3) business days of that determination.

The Trustee shall transmit copies of all Bids to counsel to the Stalking Horse Purchaser via facsimile, hand-delivery, overnight mail or electronic mail, promptly after receipt.

The Stalking Horse Purchaser shall be a Qualified Bidder with respect to the Assets and the Purchase Agreement is a Qualified Bid with respect to the Assets.  Notwithstanding the Purchase Agreement, the Stalking Horse Bidder shall also be deemed a Qualified Bidder for purposes of making a bid at the Auction on any Lot or Lots, and shall not be required to otherwise qualify prior to the Bid Deadline in conformity with the foregoing requirements imposed on other Qualified Bidders.

### Expense Reimbursement

The Trustee has agreed to pay the Stalking Horse Purchaser the Expense Reimbursement in accordance with the terms set forth in the Purchase Agreement.

### "As Is Where Is"

The sale of the Debtor's assets that are subject to the Motion shall be on an "as is, where is" basis without representations or warranties of any kind or nature, except to the extent set forth in the respective definitive purchase agreement(s) with the Successful Bidder (or Back-up Bidder). Except as may be set forth in the definitive purchase agreement(s), any and all of the Debtor's assets shall be sold free and clear of any and all liens, claims, security interests, restrictions, charges and encumbrances of any kind or nature to the fullest extent permissible under the Bankruptcy Code, with such to attach to the net proceeds of sale in their order of priority.

### Auction

The Trustee shall conduct an auction (the "Auction") to determine the highest and best bid(s) for the Assets beginning at 10:00 a.m. (prevailing Boston, Massachusetts time) on _____, 2010 at the offices of Craig and Macauley Professional Corporation, Federal Reserve Plaza, 600 Atlantic Avenue, 29th Floor, Boston, MA 02210, or at such later time and at such other place as the Trustee shall notify all Qualified Bidders and all other persons entitled to attend the Auction.

Only the Trustee, Qualified Bidders and such other persons expressly invited by the Trustee, including in each case their respective advisors, will be permitted to attend the Auction. The Trustee and her advisors shall direct and preside over the Auction.

At the opening of the Auction, the Trustee shall announce the then highest and best bid(s) for the Assets and for the Lots (each, a "Baseline Bid"), and the manner in which bidding on the Assets will proceed at the Auction. Bidding thereafter shall be made on an open basis, on the record of the Auction and all material terms of each successive Bid shall be fully disclosed to all other Qualified Bidders (including the Stalking Horse Purchaser) present at the Auction.

Any Qualified Bidder may bid on any Lot for which it has submitted a Bid and any other Lot or Lots or on substantially all Assets in the discretion of the Trustee.

The Trustee may announce at the Auction such additional rules that she believes reasonable and necessary to maximize the value of the Debtor's estate, so long as such rules are not inconsistent with the Bid Procedures. The Trustee may auction each Lot, combination of Lots and/or the aggregate of all Lots in any manner that she deems advisable. Prior to the last round of the Auction, the Trustee shall have determined, and announced to all Qualified Bidders present, (i) the individual highest and best bids for the Lots or combination of Lots, to the extent bids shall have been made, with the total of all such bids, and (ii) the highest and best bid for

substantially all of the Assets after taking into account the Expense Reimbursement.  In the last round of the Auction, the bidders for substantially all of the Assets and the combined highest and best Lot bidders, if any, will be permitted to bid against each other to determine the highest and best bidder for the Assets.  If deemed appropriate by the Trustee, the Trustee may on the record authorize individual Lot bidders to communicate and combine bids to jointly bid against combined and/or aggregate Lot bids.

### Bidding Increments

The Trustee may establish such bidding increments as she deems reasonable in connection with the Sale.

### Closing the Auction

At the conclusion of the bidding, the Trustee shall determine in the exercise of her reasonable business judgment the highest and best bid for all of the Assets or, cumulatively, the Lots (each, the "Successful Bid").  Such exercise of reasonable business judgment must include consideration of the Trustee's obligation to pay the Stalking Horse Purchaser the Expense Reimbursement if the Stalking Horse Purchaser is not the Successful Bidder for substantially all of the Assets.  The Trustee reserves the right to select the next highest or otherwise best offer after each Successful Bid as a back-up bid (the "Back-Up Bid").

### Sale Hearing

The Trustee shall seek approval of the Successful Bid(s) at the Sale Hearing to be conducted by the Bankruptcy Court on _____, 2010 or at such later date as may be established by the Bankruptcy Court.  The Trustee will not have accepted the Successful Bid(s) unless and until the Bankruptcy Court has approved the Successful Bid at the Sale Hearing and entered the Sale Order.

### Return of Good Faith Deposit

Good Faith Deposits of the Successful Bidder(s) shall be applied to the purchase price of such transaction at Closing.  The Good Faith Deposit of the Back-up Bidder(s) shall be held in an interest-bearing account until five (5) days after the Closing of the transactions contemplated by the Successful Bid(s), and thereafter returned to the Back-up Bidder(s).  Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until no later than two (2) business days after entry of the Sale Order and thereafter returned to the respective bidders.  If a Successful Bidder(s) or the Back-up Bidder(s), as appropriate, fails to consummate an approved sale because of a breach or failure to perform on the part of such Bidder, the Trustee shall be entitled to retain the Good Faith Deposit as part of its damages (subject to the terms of the applicable purchase agreement) resulting from the breach or failure to perform by such Bidder(s).  The deposit provided by the Stalking Horse Purchaser shall be returned or applied in accordance with the terms of the Purchase Agreement, unless the Stalking Horse Purchaser is a Successful Bidder for one or more Lots, in which case its deposit will be applied to that purchase obligation.

**Miscellaneous Provisions**

The Trustee reserves the right, in her discretion, to modify the Bid Procedures as the Trustee deems appropriate to obtain the highest and best Bid for the Assets, so long as such modification is not inconsistent with the terms hereof, including the Bid Procedures.

The Trustee, in her discretion, subject to the Court's review if challenged by any interested party, may (a) determine which Qualified Bid, if any, is the highest and best offer for the Assets, and (b) reject at any time before entry of the Sale Order any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtor, its estate, and creditors, provided, however, that the Trustee shall not reject any theretofore Successful Bid as a result of a new bid received by the Trustee after the close of the Auction, whether made by a Qualified Bidder who participated in the Auction, or otherwise.

16.     The Trustee submits that implementation of the Bid Procedures will facilitate the

bidding for the Assets. The Trustee does not believe that at this juncture, given the need to sell

the Debtor's assets on an expedited basis, the approval of the Bid Procedures will chill any

bidding. Rather, the Trustee respectfully submits that approval of the Bid Procedures is in the

best interests of the Debtor's estate in that it provides a structure and format for all potentially

interested parties to equally formulate a bid for the Assets and Lots and participate in the sale

process. Importantly, the Bid Procedures enable the Trustee to entertain Bids in order to ensure

the Debtor's estate and creditors receive the highest and best possible price.

**D.      The Expense Reimbursement**

17.     Subject to the terms of the Purchase Agreement, the Trustee seeks authorization to

reimburse the Stalking Horse Purchaser its demonstrated out-of-pocket expenses up to $30,000

in connection with the Sale, in accordance with the terms and conditions of the Purchase

Agreement.

18.     The obligation of the Trustee to pay the Expense Reimbursement shall constitute

an allowed administrative expense under section 503(b)(1) of the Bankruptcy Code. To the

extent (and only if) a competing transaction(s) is consummated, the Expense Reimbursement shall be paid out of the deposit given by the Successful Bidder(s) (or Back-Up Bidder(s)) free and clear of all Encumbrances without the need for further order of this Court.

19.     The obligation of the Trustee to pay the Expense Reimbursement shall be taken into account in the Trustee's determination of the highest and best bid in each round of bidding for the Assets and/or Lots and in the amount of deposit required by the Trustee in connection with any bid for the Assets and/or Lots.

20.     The Expense Reimbursement will work to maximize the value of the Debtor's estate by encouraging only those bids which are truly higher or better than the offer by the Stalking Horse Purchaser set forth in the Purchase Agreement.

**E.      Notice of Auction and Sale Hearing and Lien Bar Date, Bid Procedures and Objection Deadlines**

21.     To facilitate the Bid Procedures, the Trustee respectfully requests that the Court schedule the Sale Hearing at the convenience of the Court, during the week of March 29, 2010 and set the Bid Deadline and Auction in advance thereof.  Moreover, the Trustee respectfully requests that the Court approve the Notice of Auction and Sale and Lien Bar Date (as that term is defined below) and the Notice of Proposed Assumption and Assignment and Cure Amount Notice (as defined below), in substantially the form of the notices attached as Exhibit 2 and Exhibit 3 to the Bidding Procedures Order.

**1.      The Notice of Auction and Sale and Lien Bar Date**

22.     Not later than three (3) business days after the entry of the Bidding Procedures Order, the Trustee will cause notice of the Auction and Sale Hearing and Lien Bar Date, in a form substantially similar to the form attached to the Bidding Procedures Order as Exhibit 2 (the "Notice of Auction and Sale and Lien Bar Date"), and a copy of the Bidding Procedures Order

approving the Bid Procedures in the form approved by this Court, to be sent by first-class mail,

postage-prepaid to: (i) the creditors holding the 20 largest unsecured claims against the Debtor's

estate; (ii) all parties to the Contracts; (iii) all parties that filed requests for notices in this case;

(iv) the governmental entities listed on Schedule 7.1 of the Purchase Agreement; (v) any party

disclosed in the Purchase Agreement as having asserted a secured claim; (vi) Genentech, Inc.,

(vii) Althea Technologies, Inc.; and (viii) the Office of the United States Trustee.  The Trustee

will also provide notice to those parties identified by the Debtor as potentially interested parties

and all parties that have contacted the Trustee regarding possible interest in the Debtor's assets.

23.     Except to the extent otherwise provided in the Bidding Procedures Order or by

further order of the Court, the Trustee seeks authorization to serve any party in interest with

notice of the Auction and Sale Hearing, Lien Bar Date, orders, pleadings and notices by

providing notice (the "Notice of Documents") to such parties that copies of such documents are

available on special counsel to the Trustee's website at

www.craigmacauley.com/AltusPleadings.html in an area designated for pleadings and

information in the Debtor's case.  The Trustee seeks approval of the Notice of Documents in

substantially the form attached to the proposed Bidding Procedures Order as Exhibit 3.

### *2.     Proposed Procedures for Assumption and Assignment of Certain Agreements*

24.     To further facilitate the Sale, the Trustee will serve, via first class mail, a notice

(the "Notice of Proposed Assumption and Assignment and Cure Amount Notice"), in a form

substantially similar to the form attached to the Bidding Procedures Order as Exhibit 4, not later

than three (3) business days after the entry of the Bidding Procedures Order on each counterparty

to the Contracts.  As soon as practicable after an amendment to the Notice of Proposed

Assumption and Assignment and Cure Amount Notice adding a Contract thereto (any such

contract, an "Additional Contract"), the Trustee will serve notice (the "Additional Contract Notice") to each affected counterparty of the proposed assumption and assignment of the Additional Contract and of any Cure Costs associated therewith by overnight delivery service, facsimile, electronic transmission or by hand.

　　　　25.　　The Trustee proposes to attach to the Notice of Proposed Assumption and Assignment and Cure Amount Notice its calculation of the undisputed cure amounts that she believes must be paid to cure all defaults or compensate for pecuniary losses under each Contract (the "Cure Cost"). If no amount is listed on the Notice of Proposed Assumption and Assignment and Cure Amount Notice, the Trustee believes that there is no Cure Cost. Unless the non-debtor party files an objection (the "Cure Amount Objection") to its scheduled Cure Cost, or on adequate assurance of future performance or any other grounds by the later of (a) the objection date set by the Court in the Bidding Procedures Order and (b) in the case of an Additional Contract, 4:00 p.m. (prevailing Boston, Massachusetts time) on the date that is five (5) business days following the Trustee's service of the Additional Contract Notice, and serves the objection so that it is actually received before such deadline upon: (a) Lynne F. Riley, Esq., Altman Riley Esher LLP, 100 Franklin Street, Boston, MA 02110; (b) special counsel to the Trustee, Christopher J. Panos, Esq., Craig and Macauley Professional Corporation, Federal Reserve Plaza, 600 Atlantic Avenue, Boston, MA 02110; and (c) counsel to the Stalking Horse Purchaser, Guy B. Moss, Esq., Riemer & Braunstein LLP, Three Center Plaza, Boston, MA 02108, then the Trustee may assume and assign such Contract to the Successful Bidder(s) (or Back-up Bidder(s)) and such non-debtor party shall: (i) be forever barred from objecting to the Cure Cost and from asserting any additional cure, pecuniary loss or other amounts with respect to such Contract, and the Trustee shall be entitled to rely solely on the Cure Cost; (ii) be forever barred from objecting

to the assumption and assignment of a Contract to the Successful Bidder(s) (or Back-up

Bidder(s)) on adequate assurance of future performance or any other grounds; (iii) be forever

barred and estopped from asserting or claiming against the Trustee, the Debtor, the Stalking

Horse Purchaser or any other Successful Bidder(s) (or Back-up Bidder(s)) or any other assignee

of the relevant Contract or any successor or assignee thereof that any additional amounts are due

or defaults exist under such Contract; and (iv) be deemed to have consented to the assumption

and assignment of such Contract.

26.     Moreover, unless the non-debtor party files a Cure Amount Objection on a timely

basis pursuant to and in accordance with the requirements set forth above, such non-debtor party

shall be deemed to have been provided with adequate assurance of future performance under the

applicable Contract, and shall be forever barred from raising any defense, claim, or objection

with respect to the assignment of such Contract on account of the financial condition of the

Stalking Horse Purchaser or any other Successful Bidder(s) (or Back-up Bidder(s)).

27.     If a Cure Amount Objection is timely filed, the Cure Amount Objection must set

forth: (a) the basis for the objection; (b) with specificity, the amount the party asserts as the Cure

Cost; and (c) the documentation relied upon in support of the asserted Cure Cost.  In addition,

any Cure Amount Objection shall contain an email address for counsel to the objecting party to

be served with further notices or information.

28.     Hearings on Cure Amount Objections (and objections to the adequate assurance of

future performance under the Contracts to be assumed and assigned to the Stalking Horse

Purchaser or any other Successful Bidder(s) (or Back-up Bidder(s)), which must be raised in

accordance with the procedures below) may be held (a) at the Sale Hearing, or (b) on such other

date the Court directs; provided, however, that if a Contract is assumed and assigned, the Cure

Cost asserted by the objecting party (or such lower amount as may be fixed by the Court) shall be deposited and held in a segregated account by the Trustee pending further order of the Court or mutual agreement of the parties. At the hearing(s) on Cure Amount Objections, the Court will consider evidence necessary to determine any factual issues relating thereto.

29.    If an Auction is conducted and the Successful Bidder(s) is a party other than the Stalking Horse Purchaser, the Trustee shall cause a notice identifying the Successful Bidder(s) to be sent by electronic transmission or overnight courier to all parties to the Contracts within one (1) day of the conclusion of the Auction. If the Stalking Horse Purchaser is not the Successful Bidder(s) for the Assets, and such Successful Bidder(s) is seeking to have the Contracts assumed and assigned as part of its (or their) Bid(s), the Trustee will provide financial information for the Successful Bidder(s) to all non-debtor parties to such Contracts within one (1) day of the conclusion of the Auction by electronic transmission or overnight courier.

30.    The Trustee's decision to assume and assign the Contracts shall be subject to Court approval and consummation of the Sale. Absent consummation of the Sale each of the Contracts set forth in the respective Notice of Proposed Assumption and Assignment and Cure Amount Notice shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code.

31.    Except to the extent otherwise provided in the Purchase Agreement, or the definitive purchase agreement with the Successful Bidder(s) (or Back-up Bidder(s)), the assignee of any Contract will not be subject to any liability to the counterparty of the assigned Contract that accrued or arose before the closing date, and the Debtor's estate shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

### *3.    Possible Sublicensing of Vertex Technology Agreement*

32.    The Debtor is party to a technology license agreement between it and Vertex
Pharmaceuticals Incorporated ("Vertex") made as of February 1, 1999 (the "Vertex License
Agreement").  The Vertex License Agreement is an executory contract within the meaning of the
Bankruptcy Code relating to certain intellectual property rights granted by Vertex to the Debtor.
In the event that the Assets are sold in the aggregate to one Successful Bidder, the Trustee
intends to seek authority to assume and assign the Vertex License Agreement to the Successful
Bidder.  The Trustee asserts that the Vertex License Agreement is assignable under applicable
non-bankruptcy law and under section 365 of the Bankruptcy Code.  In the event that the Assets
are sold to multiple Successful Bidders, the Trustee intends to sublicense the Vertex License
Agreement to each Successful Bidder except for one Successful Bidder to whom the Trustee
intends to seek authority to assume and assign the Vertex License Agreement as burdened by the
sublicenses to the other Successful Bidders.   Paragraph 2.1 of the Vertex License Agreement
permits the Debtor to freely sublicense with notice to Vertex.  As part of the Sale Order the
Trustee seeks confirmation of her authority to enter into such sublicense(s).

### *4.    Lien Bar Date*

33.    The Trustee asserts that there are no Encumbrances of record or otherwise on any
of the Assets.  The Trustee requests that, unless any party claiming an Encumbrance with respect
to any of the Assets files a statement of claim asserting the (i) amount of the claim, (ii) assets
subject to the asserted lien, and (iii) basis for such lien claim no later than the Lien Bar Date and
serves such claim so that it is actually received no later than the Lien Bar Date upon (i) Lynne F.
Riley, Esq., Altman Riley Esher LLP, 100 Franklin Street, Boston, MA 02110, (ii) special

counsel to the Trustee, Christopher J. Panos, Esq., Craig and Macauley Professional Corporation, Federal Reserve Building, 600 Atlantic Avenue, Boston, MA 02210, and (iii) counsel to the Stalking Horse Purchaser, Guy B. Moss, Esq., Riemer & Braunstein LLP, Three Center Plaza, Boston, MA 02108, then any party claiming an Encumbrance shall: (i) be forever barred from objecting to the sale of any of the Assets free and clear of such Encumbrance, (ii) be forever barred and estopped from asserting or claiming against the Trustee, the Debtor, the Stalking Horse Purchaser or any other Successful Bidder(s) (or Back-up Bidder(s)) or any successor or assignee thereof any claim on account of such Encumbrance, and (iii) be deemed to have consented to the sale of the Assets free and clear of any and all Encumbrances.

**5.      *The Sale Hearing and Objection Deadline***

34.      Subject to the Court's calendar, the Trustee respectfully requests that the Sale Hearing be scheduled on or about the week of March 29, 2010, with an objection deadline for such Sale Hearing set for five (5) business days prior to the date scheduled for the Sale Hearing.

35.      The Trustee requests that objections, if any, to the Sale or the proposed assumption and assignment of any Contract, including any objections based upon lack of adequate assurance of future performance under sections 365(b)(1)(C) or (f) of the Bankruptcy Code, must: (a) be in writing; (b) comply with Bankruptcy Rules and Local Bankruptcy Rules; and (c) be filed no later than the time set for objections in the Bidding Procedures Order with the Clerk of the Bankruptcy Court and be served upon (i) Lynne F. Riley, Esq., Altman Riley Esher LLP, 100 Franklin Street, Boston, MA 02110, (ii) special counsel to the Trustee, Christopher J. Panos, Esq., Craig and Macauley Professional Corporation, Federal Reserve Building, 600 Atlantic Avenue, Boston, MA 02210 and (iii) counsel to the Stalking Horse Purchaser, Guy B. Moss, Esq., Riemer & Braunstein LLP, Three Center Plaza, Boston, MA 02108.

36.    In addition, the Trustee requests that if the Stalking Horse Purchaser is not the

Successful Bidder for the Assets, and the Successful Bidder(s) (or Back-up Bidder(s)) is seeking

to have Contracts assumed and assigned as part of the Sale, the non-debtor parties to such

Contracts shall have until 4:00 p.m. on the day prior to the Sale Hearing to raise objections under

sections 365(b)(1)(C) or (f) of the Bankruptcy Code.

37.    The Debtor and Genentech, Inc. ("Genentech") entered into a Collaboration and

License Agreement dated as of December 19, 2006 (the "Agreement") pursuant to which the

parties agreed to co-develop certain products.  On December 19, 2007, the Debtor and

Genentech entered into a Termination and Transition Amendment to the Collaboration and

License Agreement whereby the Agreement was terminated except that certain rights and

obligations were extended beyond the termination date, including Genentech's right to receive

royalties with respect to "Termination Products" under certain conditions (the "Royalties").  It is

not clear to the Trustee what Assets, if any, may be subject to the Royalties or under what

conditions.  Accordingly, the Trustee requests that the Sale Order provide that the sale of the

Assets be free and clear of any and all Encumbrances (other than permitted encumbrances

provided for expressly in the purchase agreement entered into with the Successful Bidder(s) or

Back-up Bidder(s)), including any claim of Genentech to Royalties, and that the order provide

that Genentech shall have no claim against the Debtor or the Debtor's estate as a result of the

consummation of the transactions contemplated by the Sale, the rejection of the Agreement or

any other agreements or otherwise.  The Trustee requests authority to reject the Agreement and

all other contracts between the Debtor and Genentech.

38.    The failure of any person to timely file its objection shall be a bar to the assertion,

at the Sale Hearing, or thereafter, of any objection to the consummation of the Sale free and clear

of any and all Encumbrances (other than permitted encumbrances provided for expressly in the

purchase agreement entered into with the Successful Bidder(s) or Back-up Bidder(s)) or the

Trustee's assumption and assignment of any Contract.

## BASIS FOR RELIEF AND APPLICABLE AUTHORITY

**A.**      ***The Bid Procedures and Expense Reimbursement Should be Approved***

39.      Section 105(a) of the Bankruptcy Code provides that the Court "may issue any

order, process or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a). As described above, approval of the Bid Procedures will greatly

assist the Trustee in maximizing value that for the Assets. Consequently, the Trustee

respectfully submits that granting the requested relief is "appropriate" under the circumstances.

40.      "The appropriate standard used by courts in reviewing a trustee's recommendation

[of a proposed sale of property] has been enunciated in myriad ways...These variations all fall

under the rubric of the 'business judgment' test." *In re Bakalis*, 220 B.R. 525, 531-532 (Bankr.

E.D.N.Y. 1998) (citations omitted). "The business judgment rule is a presumption that in

making a business decision the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action was in the best interests of the company." *In re

S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (internal quotation marks and citation

omitted). *See also Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines,

Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-

in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders,

there must be some articulated business justification for using, selling, or leasing the property

outside the ordinary course of business." (citations omitted"); *Committee of Asbestos-Related

Litigants v. Johns-Manville Corp. ( In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr.

S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions" (citations omitted)).

41.     When applying the "business judgment" rule, courts show great deference to the trustee's decision-making.  *In re Bakalis*, 220 B.R. at 532; *See also Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981).

### 1.     The Bid Procedures Are Appropriate

42.     The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtor's estate.  The proposed procedures contain terms typical for a process through which a sale as contemplated herein is consummated, and the adoption of the Bid Procedures represents a sound exercise of the Trustee's business judgment.

43.     Absent the sale of the Debtor's assets, the Trustee is unlikely to realize value for the benefit of the Debtor's stakeholders.  Accordingly, the Trustee has determined that the best option for maximizing the value of the Debtor's estate for the benefit of creditors and other constituencies is through a sale process pursuant to the Bid Procedures

44.     The Trustee believes that the Bid Procedures establish the parameters under which the value of the Assets may be maximized.  Such procedures will unquestionably increase the likelihood that the Trustee will receive the greatest possible consideration for such assets because they will ensure a competitive and fair bidding process.

### 2.     The Expense Reimbursement is Appropriate

45.     The Trustee submits that the Expense Reimbursement should be approved as it will encourage bidding rather than chill it.  Historically, bankruptcy courts have approved bidding incentives similar to the Expense Reimbursement offered here under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board

of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Associates, L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking" (citation omitted)); *In re Marrose Corp.,* Case Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) (bidding incentives are "meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

46.    The Expense Reimbursement meets the "business judgment rule."  Bidding incentives such as the Expense Reimbursement encourage a potential purchaser to act as a "stalking horse" in the context of a bankruptcy sale, that is, to invest time, money and effort to negotiate with a trustee despite the inherent risks and uncertainties of the bankruptcy process. The Expense Reimbursement provides potential purchasers with a bench mark against which to bid and will enable them to submit their own adaptation of the Purchase Agreement to make a bid.  Likewise, the Debtor's estate has been benefited by the "floor" price established by the Stalking Horse Purchaser for the Assets in the Purchase Agreement.  Additionally, the Trustee believes that providing this incentive to the Stalking Horse Purchaser will enhance prospects for spirited bidding on the Assets.

47.    Absent authorization of the Expense Reimbursement, the Trustee may lose the opportunity to obtain the highest and best offer for the Assets.  If the protection is not approved, the Stalking Horse Purchaser has the right in the Purchase Agreement to terminate the contract, and therefore may not go forward with the purchase of the Assets.

48.    The Trustee therefore respectfully requests that the Expense Reimbursement be approved and that the Court authorize the payment of the Expense Reimbursement.

**B.      The Sale of the Debtor's Assets is Within the Sound Business Judgment of the Trustee
and Should be Approved**

49.      The Bankruptcy Code provides for the sale of a debtor's assets out of the ordinary

course of business.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "The

trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of

business, property of the estate."  Moreover, the Bankruptcy Code provides that "[t]he court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title."  11 U.S.C. §105(a).  Courts interpreting section 363(b)(1) have approved such sales

so long as the decision to sell assets outside the ordinary course of business is based upon the

sound business judgment of the trustee.  *In re Lionel Corporation,* 722 F.2d 1063, 1070-71 (2nd

Cir. 1983); *In re Baldwin United Corp.,* 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984); In Re

Allison, 39 B.R. 300, 301 (Bankr. D.N.M. 1984); *In re St. Petersburg Hotel Association Ltd.,* 37

B.R. 341, 343 (Bankr. N.D. Fla. 1983).

50.      In this case, the Trustee submits that the decision to proceed with the sale of the

Debtor's assets, and the Bid Procedures related thereto, are based upon her sound business

judgment and should be approved.  For the reasons set forth above, the Trustee believes that it is

essential to sell the Debtor's assets promptly.  Simply put, it is necessary to promptly sell the

Debtor's assets to avoid deterioration in their value and to avoid unnecessary expense associated

with preserving the assets.  The Trustee believes that the Bid Procedures and Auction will

generate interest and bidding, and the bidding process will yield the highest and best bid for the

Assets.  Accordingly, the Trustee believes that the relief sought by this Motion is not only

reasonable, but necessary, to maximize the value of the Debtor's estate for the benefit of its

stakeholders.

**C.**    ***The Sale of the Debtor's Assets will Satisfy the Requirements of Section 363(f) of the
Bankruptcy Code***

51.    The Trustee requests authority to sell the Assets free and clear of liens, claims,

charges, security interests, restrictions and encumbrances of any kind or nature (collectively,

"Encumbrances") to the fullest extent permitted by the Bankruptcy Code, with such

Encumbrances, if any, to attach to the net proceeds of the Sale.  The Trustee asserts that there are

no Encumbrances with respect to the Assets.  Under section 363(f) of the Bankruptcy Code, a

trustee may sell all or any part of a Debtor's property free and clear of any and all liens, claims

or interests in such property if one of the following conditions is satisfied: (a) such a sale is

permitted under applicable non-bankruptcy law; (b) the party asserting such lien, claim or

interest consents to such sale; (c) the interest is a lien and the purchase price for the property is

greater than the aggregate value of all liens on the property; (d) the interest is subject to a bona

fide dispute; or (e) the party asserting the lien, claim or interest could be compelled, in a legal or

equitable proceeding, to accept a money satisfaction for such interest.

52.    To the extent necessary, the Trustee expects that she will satisfy one or more of

such conditions at the Sale Hearing.  Except for what appears to be the assertion of an attorney's

lien for $4,426.13 by Fish & Richardson P.C., the Trustee does not believe that any entity will

assert a lien covering any asset proposed to be sold.

53.    Further, applicable case law provides that section 363(f) of the Bankruptcy Code

permits a trustee to sell assets free and clear of all liens, claims and encumbrances with such

liens, claims and encumbrances attaching to the net proceeds of the sale.  *Folger Adam Security,*

*Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000) ("[T]he holdings of the

courts suggest that any interest in property that can be reduced to a money satisfaction

constitutes a claim for purposes of section 363(f) and, therefore, attaches to the proceeds of the

sale."); *In re WPRV-TV, Inc.,* 143 B.R. 315, 321 (D.P.R. 1991); *In re Elliot,* 94 B.R. 343, 345

(E.D. Pa. 1988).

**D.    *"Good Faith" under Section 363(m) of the Bankruptcy Code***

54.    The Trustee requests that the Court find that the Successful Bidder(s) (or any

Back-Up Bidder(s)) is entitled to the benefits and protections provided by section 363(m) of the

Bankruptcy Code.

55.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) and (c) of
> this section of a sale or lease of property does not affect the validity of a sale or lease
> under such authorization to an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal, unless such authorization
> and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

56.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

assets if the order allowing the sale is reversed on appeal.

57.    Although the Bankruptcy Code does not define "good faith," the First Circuit, in

*Geylock Glen Corp. v. Community Savings Bank*, has utilized the traditional equitable definition

of good faith requiring that a purchaser provide value in good faith, and without knowledge of

adverse claims.  656 F.2d 1, 4 (1st Cir. 1981); *Tri-Cran, Inc. v. Fallon (In re Tri-Cran, Inc.),* 98

B.R. 609, 618 (D. Mass. 1989).

58.    Here, the sale of the Assets and the assignment of the Contracts will be in good

faith.  The record made at the Sale Hearing will demonstrate the absence of fraud or collusion in

connection with the sale of the Assets and the assignment of the Contracts.  As discussed

throughout this Motion, and as will be confirmed at the Sale Hearing, the Purchase Agreement

(or the comparable asset purchase agreement with the Successful Bidder(s)) will be the

culmination of a solicitation and negotiation process in which all parties will be represented by

counsel.  All negotiations have been and will continue to be conducted on an arms length, good

faith basis.  With respect to potential bidders, the Bid Procedures are designed to ensure that no

party is able to exert undue influence over the process.  Moreover, the identities of the parties

participating in the bidding will be disclosed to the Trustee and the Court, and such bids are

subject in all respects to section 363(n) of the Bankruptcy Code.  Under the circumstances, the

Successful Bidder(s) (or Back-up Bidder(s)) should be afforded the protections that section

363(m) of the Bankruptcy Code provides to a good faith purchaser.  Further, the Bid Procedures

are designed to prevent potential bidders from engaging in conduct that would cause or permit

the sale of the Debtor's property to be avoided under section 363(n) of the Bankruptcy Code.

### E.  *The Assumption and Assignment of the Contracts Should be Approved*

59.    To facilitate and effectuate the sale of the Assets, the Trustee seeks authority to

assume and assign the Contracts to the Stalking Horse Purchaser or any other Successful

Bidder(s) (or Back-up Bidder(s)).

60.    Section 365 of the Bankruptcy Code authorizes a trustee to assume and/or assign a

Debtor's executory contracts and unexpired leases, subject to the bankruptcy court's approval.

Section 365 provides, in pertinent part, that:

> [e]xcept as provided in sections 765 and 766 of this title and in subsections (b), (c) and
> (d) of this section, the trustee, subject to the court's approval, may assume or reject any
> executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

61.    Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired

lease or executory contract of a debtor, and provides that:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -

    (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of the provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from a failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from the failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary lessee resulting from such default shall be compensated in accordance with the provision of this paragraph;

    (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

    (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

62.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). The Trustee submits that the cure procedures provided in this Motion, bidder qualification provided in the Bid Procedures and the arms-length nature of any transaction approved by this Court pursuant to the Auction support the position that the requirements set forth in section 365(b)(1) will be satisfied under the contemplated Sale.

63.     Courts have applied the "business judgment" standard to determine whether the assumption is in the debtor's economic best interests.  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("[A] bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." (citation omitted)); *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enterprises, Inc.* V, 183 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject a contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment – a standard which we have concluded many times is not difficult to meet." (citations omitted)); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("A trustee may assume any executory contract of a debtor subject to the Court's approval and the exceptions provided under section 365....In general, the standard to be applied for approval of the assumption is the business judgment standard..."). "Under the 'business judgment rule,' assumption is appropriate if the trustee can demonstrate that it will benefit the estate." *Chira v. Saal (In re Chira)*, 367 B.R. 888, 898 (D. S.D. Fla. 2007).

64.     The Stalking Horse Purchaser or any other Successful Bidder(s) (or Back-up Bidder(s)) may desire to take assignment of the Contracts as they relate to the Assets.  To the extent the Contracts are identified for assumption and assignment, the Trustee believes that she can and will demonstrate that all requirements for assumption and/or assignment will be satisfied at the Sale Hearing, including, if for no other reason, because such assumption and assignment is integral to a transaction resulting in the realization of value to the Debtor's estate.  The Trustee,

as required by the Bid Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid.  Further, for the reasons stated throughout this Motion, the Trustee, in the exercise of her sound business judgment, believes that selling the Assets and assuming and assigning the Contracts attendant to the operation of the Assets will be in the best interests of the Debtor's estate.

65.    The Trustee does not believe that any of the Contracts will contain provisions which purport to limit the assignment of the individual agreement.  Nonetheless, out of an abundance of caution, because, as set forth below, the Bankruptcy Code provides that such provisions are either unenforceable or may be satisfied by other means established under the Bankruptcy Code or applicable law, the Trustee requests that the assumption and assignment of the Contracts be permitted without regard to such provisions should they exist.

66.    The assumption and assignment of an executory contract or unexpired lease may be achieved without the need for curing any default therein triggered by the insolvency of the debtor, the commencement of bankruptcy proceedings, the appointment of a trustee or a penalty provision triggered by the debtor's failure to perform nonmonetary provisions. *See* 11 U.S.C. § 365(b)(2)(A)-(D).

67.    In addition, section 365(f) of the Bankruptcy Code provides that "[e]xcept as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2)" of section 365(f).  *See* 11 U.S.C. § 365(f).

68.    The Trustee requests that, in satisfaction of section 365(f), to the extent permitted under section 365 (b) and (c) of the Bankruptcy Code, the Contracts be assumed and assigned to

the Stalking Horse Purchaser or any other Successful Bidder(s) (or Back-up Bidder(s)) with the

Cure Amount as identified in the Exhibit A to the Notice of (i) Proposed Assumption and

Assignment of Certain Agreements and (ii) Amounts Necessary to Cure Defaults. The Trustee

further submits that at the Sale Hearing, in conjunction with any required showing of good faith

under section 363(m), she will demonstrate, under paragraph (2) of section 365(f), "adequate

assurance of future performance" by the Stalking Horse Purchaser or any other Successful

Bidder(s) (or Back-up Bidder(s)) for any party objecting to the proposed assumption on these

grounds and that the assumption and assignment is not otherwise prohibited under §365(b) and

(c).

69.     To the extent that a non-debtor party to a Contract fails to object to the assumption

and assignment of its Contract or the Cure Amount with respect thereto, the Trustee requests that

such party be deemed to have consented to the assumption and assignment and Cure Amount. *In

re Tabone, Inc.,* 175 B.R. at 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor

deemed to consent). Moreover, the Trustee requests that, to the extent that no objection is

received, each such party be deemed to consent to the assumption and assignment of its Contract

notwithstanding any anti-alienation provision or other restriction on assignment. *E.g.,* 11 U.S.C.

§§ 365(c)(1)(B), (e)(2)(A)(ii) and (f).

70.     Finally, pursuant to section 365(k), the Trustee requests that the Debtor's estate be

relieved from any further liability with respect to the Contracts after assumption and assignment

to the Successful Bidder(s) (or Back-up Bidder(s)). *See* 11 U.S.C. § 365(k).

**F.      *Approval of Possible Sublicensing of Vertex Technology Agreement***

71.     To facilitate and effectuate the sale of the Assets in Lots to multiple Successful

Bidders, the Trustee seeks authority to sublicense the Vertex Technology Agreement and to

subsequently assume and assign the Vertex Technology Agreement. The intellectual property

rights licensed by Vertex to the Debtor are necessary for the function and development of certain

of the Assets. In the event that the Assets are sold in Lots to multiple Successful Bidders, in

order for certain of the Assets to have value and be exploited, the Successful Bidder will need to

utilize the intellectual property rights granted to the Debtor under the Vertex Technology

Agreement. Accordingly, as set forth above, in the event that the Assets are sold to multiple

Successful Bidders, the Trustee intends to sublicense patents subject to the Vertex License

Agreement on an exclusive basis within the applicable field to each Successful Bidder other than

one Successful Bidder to whom the Trustee intends to seek authority to assume and assign the

Vertex License Agreement (burdened by the sublicenses granted by the Trustee to the other

Successful Bidders).

72.     The Vertex License Agreement provides that the Debtor may sublicense the

intellectual property rights granted thereunder to third parties. Accordingly, the Trustee seeks

authority to sublicense such rights to various Successful Bidders in the event that the Assets are

sold in Lots to multiple Successful Bidders.

## G.     *Establishment of Lien Bar Date is Appropriate*

73.     The Trustee seeks the establishment of the Lien Bar Date pursuant to which all

parties asserting an Encumbrance against any of the Assets must file a statement of claim

asserting the amount of their claim and basis for such lien claim.

74.     Section 105(a) of the Bankruptcy Code and Rule 3003(c)(3) of the Bankruptcy

Rules grant this Court the authority to enter an order that sets a deadline by which affected

parties must file a claim. The Trustee seeks to establish 4:00 p.m. (prevailing Boston,

Massachusetts time) on a date in advance of the Auction and Sale Hearing as the Lien Bar Date

and submits that such Lien Bar Date is reasonable and will greatly facilitate the orderly

administration of the Sale of the Assets.

**H.    Relief from the Fourteen (14) Day Stays under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

75.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property…is stayed until expiration of 14 days after entry of the order, unless the court

orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the

trustee to assign an executory contract or unexpired lease…is stayed until the expiration of 14

days after then entry of the order, unless the court orders otherwise."  The Trustee requests that

the Sale Order, upon its entry, be effective immediately by providing that the fourteen (14) day

stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

76.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient

time for an objecting party to appeal before an order can be implemented.  *See* Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules

6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should

"order otherwise" and eliminate or reduce the stay period, one leading commentator suggests that

the stay period should be eliminated to allow a sale or other transaction to close immediately

"whether there has been no objection to the procedure."  10 *Collier on Bankruptcy* ¶ 6064.09

(15th ed. rev.).  Furthermore, the commentator states that if an objection is filed and overruled,

and the objecting party informs the court of its intent to appeal, the stay may be reduced to the

amount of time actually necessary to file such appeal.  *Id.*

77.    Accordingly, the Trustee hereby requests that the Court waive the fourteen (14)

day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE AND PRIOR RELIEF

78.     Notice of this Motion (and exhibits hereto) has been given via electronic mail transmission, facsimile, overnight mail hand delivery or first-class mail to the Office of the United States Trustee and the parties holding the twenty (20) largest claims listed on the Debtor's Schedule F.  In light of the nature of the relief requested herein, the Trustee submits that no other or further notice is necessary.

79.     No previous request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Trustee respectfully requests that the Court: (i) enter an order, substantially in the form attached hereto as Exhibit A, approving the Bid Procedures; (ii) enter an order, substantially in the form attached hereto as Exhibit C, approving the sale of the Assets to the Stalking Horse Purchaser or any other Successful Bidder(s) (or Back-up Bidder(s)) consistent with this Motion; and (iii) grant such further and other relief as the Court deems just and proper.

Respectfully Submitted,

LYNNE F. RILEY, CHAPTER 7 TRUSTEE

By her Special Counsel

February 10, 2010          /s/ Christopher J. Panos
                           Christopher J. Panos (BBO# 555273)
                           Kathleen A. Rahbany (BBO# 654322)
                           Craig and Macauley
                               Professional Corporation
                           Federal Reserve Plaza
                           600 Atlantic Avenue
                           Boston, Massachusetts  02210
                           (617) 367-9500
                           fax (617) 742-1788

# EXHIBIT A

# EXHIBIT B

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**(EASTERN DIVISION)**

In re:

ALTUS PHARMACEUTICALS INC.,

            Debtor.

Chapter 7
Case No. 09-20886-WCH

<u>CERTIFICATE OF SERVICE</u>

       I, Kathleen A. Rahbany, hereby certify that on February 10, 2010, I caused a copy of the foregoing to be served on the parties set forth below at the addresses indicated thereon by first class mail, postage prepaid or the Court's ECF system.

February 10, 2010

          /s/ Kathleen A. Rahbany
          Kathleen A. Rahbany

- Samuel Adams Aylesworth    saylesworth@cambridgema.gov
- John Fitzgerald      USTPRegion01.BO.ECF@USDOJ.GOV
- Lynne F. Riley     riley.ecf@are-law.com, ma14@ecfcbis.com;paralegal.ecf@are-law.com
- Lynne F. Riley     rileytrustee.ecf@are-law.com, MA14@ecfcbis.com;paralegal.ecf@are-law.com
- Annapoorni Sankaran     sankarana@gtlaw.com, maximn@gtlaw.com;koglins@gtlaw.com;sepulvedas@gtlaw.com
- Jennifer L. Stewart     jstewart@cooley.com, swalsh@cooley.com;kcachia@cooley.com;BWeisenberg@cooley.com;ncunningham@cooley.com

AAI Pharma
2320 Scientific Park Drive
Wilmington, NC 28405

ABEC Inc.
4420 E. Mustard Way
Springfield, MO 65803

Althea Technologies
11040 Roselle Street
San Diego, CA 92121

Aptuit Inc.
10245 Hickman Mill Drive
Kansas City, MO 64134

Bowne
411 D Street
Boston, MA 02211

Burkhard Blank
25 Watson Street
Cambridge, MA 02139

CIMA
7325 Aspen Lane
Minneapolis, MN 55428

Charles River Labs - DDS
251 Ballardvale Street
Wilmington, MA 01887

Children's Memorial Hospital
2300 Children's Plaza
BOX#205
Chicago, IL 60614

Halloran Consulting Group Inc.
135 Beaver Street, Suite 211
Waltham, MA 02452

Image Solutions, Inc.
100 S. Jefferson Road
Whippany, NJ 07981

Johnson Controls, Inc.
39 Salem Street
Lynnfield, MA 01940

Jonathan Lieber
4 High Rock Terrace
Chestnut Hill, MA 02467

MD Evidence
107 S. Sweetzer Ave. Suite 105
Los Angeles, CA 90048

Mayo Clinical Trial Services
P.O. Box 4100
Rochester, MN 55903

NAMSA
PO Box 710970
Cincinnati, OH 45271

PPD Development, LP
12937 Collections Center Drive
Chicago, IL 60693

Shire HGT
700 Main Street
Cambridge, MA 02139

Thomson Financial LLC
195 Broadway
New York, NY 10007

University Pediatric Association
239 Bryant Street
Buffalo, NY 14222