**EXECUTION COPY**

# EXHIBIT 2

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of ~~February 9,~~March 19, 2010 (this "Agreement"), between ~~Milk 401 Partners, LLC, a Massachusetts limited liability company~~Althea Technologies, Inc., a Delaware corporation ("Purchaser"), and Lynne F. Riley, as Chapter 7 Trustee (the "Trustee") of Altus Pharmaceuticals Inc. (the "Company"), a Delaware corporation (acting in her capacity as Trustee, the "Seller").

W I T N E S S E T H:

WHEREAS, the Company has filed a voluntary petition for relief (the "Petition") under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), Case No. 09-20886-WCH (the "Bankruptcy Case") and the Seller was appointed Trustee for the Company;

WHEREAS, subject to the terms and conditions set forth herein and the approval and order of the Bankruptcy Court, Seller is agreeing to sell the Purchased Assets (as hereinafter defined) in accordance with sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, Purchaser is agreeing to purchase, including through one or more affiliates designated by Purchaser if it so elects, the Purchased Assets and assume certain Assumed Liabilities (as hereinafter defined), all on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, and intending to be bound hereby, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1 or in other Sections of this Agreement, as identified in the chart in Section 1.2.

1.1     Certain Definitions.

"ALTU-238" means the pharmaceutical product developed by the Company, which is a crystallized formulation of human growth hormone (hGH) for the treatment of hGH deficiency and related disorders.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Avoidance Actions" means all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof.

"Bidding Procedures Order" means ~~an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit A or as otherwise agreed by Purchaser in writing or on the record in~~ the order with respect to bidding procedures entered by the Bankruptcy Court~~,~~ as Docket No. 60 in the Bankruptcy Case.

"Business" means the oral and injectable protein therapeutics pharmaceuticals business (comprising all of the Company's business), including, in particular, the Company's proprietary protein crystallization technology, which is the basis for the Company's Products.

"Business Day" means any day of the year on which national banking institutions in Boston, Massachusetts are open to the public for conducting business and are not required or authorized to close.

"Cash Consideration" means cash in an amount of Four Hundred Seventy-Five Thousand Dollars ($~~400,000~~475,000).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, written or oral, indenture, note, bond, lease or other agreement.

"Copyrights" means copyrights, whether registered or unregistered (including copyrights in computer software programs), mask work rights, works of authorship and moral rights, and all registrations, applications and renewals therefor.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, all supporting documents for regulatory filings, operating data and plans, technical documentation (lab notebooks, manufacturing instructions and processes, design specifications, blueprints, records of experiments, electronic copies of patent applications as filed, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, process manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Purchased Assets, in each case whether or not in electronic form, and without regard to the media used.

~~"Expense Reimbursement Amount" means the amount of fees and expenses actually incurred by Purchaser to third parties in connection with the transactions contemplated hereby, including in respect of negotiations and legal documentation, and the due diligence investigation of the Company by Purchaser, not to exceed $30,000.~~

"FDA" means the United States Food and Drug Administration, or any successor agency thereto.

"FDA Act" means the United States Federal Food, Drug, and Cosmetic Act, as amended, and regulations promulgated thereunder.

"Final Order" shall mean an order as to which the time to appeal, petition for certiorari, or seek reargument or rehearing has expired and as to which no appeal or petition for rehearing or certiorari is pending or, if an appeal or petition for rehearing or certiorari has been timely filed or taken, the order or judgment has been affirmed by the highest court to which the order was appealed or the petition for rehearing or certiorari has been denied and the time to take any further appeal or to seek any rehearing or certiorari has expired.

"Equipment" means all equipment and other tangible personal property owned by Seller and listed on Schedule 2(b)(iii).

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (whether public or private in each case).

"Intellectual Property Rights" means all of the rights arising from or in respect of the following, whether protected, created or arising under the Laws of the United States or any foreign jurisdiction: (A) Patents; (B) Trademarks; (C) Copyrights; (D) confidential and proprietary information, or non-public processes, designs, specifications, technology, know-how, techniques, formulas, invention disclosures, inventions (whether or not patentable and whether or not reduced to practice), concepts, trade secrets, discoveries, ideas, research and development, compositions, manufacturing and production processes, technical data and information, customer lists, supplier lists, pricing and cost information, and business and marketing plans and proposals, in each case, excluding any rights in respect of any of the foregoing that comprise or are protected by Patents; (E) all applications, registrations and permits related to any of the foregoing clauses (A) through (D); and (F) any and all rights to institute any Legal Proceedings for past, present, or future infringement, misappropriation or other violation of any of the foregoing.

"Knowledge of Seller" means the actual knowledge of Lynne F. Riley.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or common law requirement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private), investigations or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or

agreement, transfer restriction under any shareholder or similar agreement or encumbrance or any other right of a third party in respect of an asset.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"<u>Patents</u>" means all U.S. and foreign patents, patent applications, any reissues, reexaminations, divisionals, provisionals, substitutions, renewals, continuations, continuations-in-part and extensions thereof.

"<u>Permits</u>" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"<u>Permitted Encumbrances</u>" means in relation to any asset:  (i) statutory liens for Taxes, assessments or other governmental charges not yet delinquent, (ii) mechanics', carriers', workers', repairers', landlords', warehouse and similar Liens arising or incurred in the ordinary course of business that are not yet delinquent, and (iii) any other Liens set forth on <u>Schedule 1.1(b)</u>.

"<u>Person</u>" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Petition Date</u>" means November 11, 2009.

"<u>Products</u>" means any and all products or services designed, developed, manufactured, marketed, distributed, licensed, or sold by the Company, including in particular ALTU-238.

"<u>Purchased Contracts</u>" means all Contracts listed on <u>Schedule 1.1(c)</u>.

"<u>Purchased Intellectual Property</u>" means all Intellectual Property Rights owned by or, if listed on Schedule 1.1(c), licensed to the Company, including all Intellectual Property Rights in or pertaining to the Products or Technology, methods or processes used to manufacture the Products.

"<u>Purchaser Material Adverse Effect</u>" means a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

"<u>Registrations</u>" means the investigational new drug applications held or made by the Company relating to the Purchased Assets each of which is listed on <u>Schedule 1.1(d)</u>, and all related correspondence, reports and other submissions to Governmental Bodies that relate to the Purchased Assets.

"<u>Sale Order</u>" means an order of the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code, in substantially the form set forth in <u>Exhibit BA</u> or as otherwise agreed by Purchaser in writing or on the record in the Bankruptcy Court, approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby.

"Seller Material Adverse Effect" means a material adverse effect on (a) the Purchased Assets, taken as a whole, or (b) the ability of the Seller to perform her obligations under this Agreement; provided, however, that none of the following (or the results thereof) shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a "Seller Material Adverse Effect":   (a) changes in Law or interpretations thereof by any Governmental Authority, other than such changes that would have a disproportionate effect on the Company, taken as a whole, as compared to other Persons in the industries in which it operated, (b) changes in generally accepted accounting principles in the United States or elsewhere, (c) actions or omissions taken or not taken in good faith by or on behalf of Seller in order to comply with the express terms of this Agreement or with the consent of Purchaser, or the results thereof, (d) actions or omissions of Purchaser or its Affiliates, or the results thereof, (e) changes in general economic conditions, currency exchange rates or United States or international debt or equity markets, (f) events or conditions generally affecting the industry or markets in which the Company operates, (g) national or international political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America or any other national or international hostilities, acts of terror or acts of war, (h) any matter to the extent described in the schedules to Article V of this Agreement, (i) the announcement of the signing of this Agreement or the consummation of the transactions contemplated hereby, and (k) actions, omissions, events and circumstances arising out of or relating to the auction contemplated by this Agreement, or the Bankruptcy Case.

"Subsidiary" means Altus Pharmaceuticals Securities Corp., a Massachusetts corporation.

"Tax Authority" means any government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Tax Return" means all returns, declarations, reports, estimates, filings, information returns and statements required to be filed in respect of any Taxes (including any schedules, exhibits, or attachments thereto or amendments thereof).

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, workers' compensation, customs duties, registration, documentary, occupation, real and personal property and estimated taxes, (ii) any item described in clause (i) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under section 1502 of the Code or any predecessor or successor thereof or any analogous or similar provision under state, local, or foreign law, or by contract, assumption, indemnity or otherwise, and (iii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i) or (ii).

"Technology" means, collectively, all designs, formulas, algorithms, procedures, techniques, ideas, know-how, software, internet websites and web content, tools, inventions

(whether patentable or unpatentable and whether or not reduced to practice), invention disclosures, developments, creations, improvements, works of authorship, other similar materials and all recordings, graphs, drawings, reports, analyses, other writings and any other embodiment of the above, in any form or media, whether or not specifically listed herein, and all related technology, documentation and other materials used in, incorporated in, embodied in or displayed by any of the foregoing, or used or useful in the design, development, reproduction, maintenance or modification of any of the foregoing.

"Trademarks" means registered or unregistered trademarks, service marks, trade dress rights, trade names, Internet domain names, identifying symbols, logos, emblems, signs or insignia, and including all goodwill associated with the foregoing, and all registrations, applications and renewals therefor.

1.2    Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|------|---------|
| Agreement | Preamble |
| Allocation Statement | 10.2 |
| Assumed Liabilities | 2.3 |
| Back-Up Bidder | ~~7.4~~7.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Closing | 4.1 |
| Closing Conditions | 4.1 |
| Closing Date | 4.1 |
| Confidential Information | 8.4(b) |
| Company | Preamble |
| Competing Transaction | 7.2(a) |
| Cure Amounts | 2.5 |
| Deposit Amount | 3.2 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Necessary Consent | 2.6 |
| Petition | Recitals |
| Purchased Assets | 2.1(b) |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Sale Motion | 7.1 |
| Seller | Preamble |
| Solicitation Period | 7.2(a) |
| Termination Date | 4.4(a) |
| Transfer Taxes | 10.1 |

1.3    Other Definitional and Interpretive Matters.

(a)      Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to "dollars" or "$" shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)      The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

ARTICLE II

PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1   Purchase and Sale of Assets.

(a)      On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the

7

Purchased Assets, free and clear of all Liens other than Permitted Encumbrances, pursuant to section 363(f) of the Bankruptcy Code.

(b)      For all purposes of and under this Agreement, the term "Purchased Assets" shall mean ~~all of~~ the following properties, assets and rights of Seller (other than the Excluded Assets) existing as of the Closing, real or personal, tangible or intangible related to the Business~~, including~~:

      i.      the inventory and raw materials listed on Schedule 2.1(b)(i);

      ii.      all deposits and prepaid charges and expenses of the Company directly related to Purchased Intellectual Property;

      iii.      the Equipment ~~located in the United States, including as~~ described in Schedule 2.1(b)(iii) located at Althea Technologies Inc. in or around San Diego, California;

      iv.      the Purchased Intellectual Property, including, without limitation, the Patents set forth on Schedule 2.1(b)(iv);

      v.      ~~the Purchased Contracts~~ all of the Company's and Seller's right, title and interest in, under, and to the Purchased Contracts, including without limitation any royalties payable under any Purchased Contract or any other right to payment or causes of action in any way relating thereto;

      vi.      all Documents of the Company that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to research and development, clinical trials, Products, correspondence related to any Product, services, marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, but excluding any Documents exclusively related to an Excluded Asset;

      vii.      all Permits used by the Company in the Business, subject to Section 2.2(i) and Section 2.7;

      viii.      [reserved];

      ix.      all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current and former employees and agents of the Company or with third parties ~~to the extent~~ relating to the Purchased Assets (or any portion thereof) , including all non-disclosure agreements executed by parties to which ~~the Trustee~~ Seller has made available information about the Company, whether or not such agreements are included as Purchased Contracts;

      x.      all claims and causes of action which Seller, the Company or any of its Affiliates may have against any ~~third Person, and all rights of indemnity,~~ Person for infringement of Purchased Intellectual Property or breach of non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current and former employees and agents of the Company or

8

with third parties relating to the Purchased Assets (or any portion thereof), including all non-disclosure agreements executed by parties to which Seller has made available information about the Company, whether or not such agreements are included as Purchased Contracts, and warranty rights, rights of contribution, rights of ~~refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by the Company, with respect to the Purchased Intellectual Property occurring on or prior to the Closing Date, except as provided in Section 2.2(b)~~reimbursement, and claims and causes of action directly relating to the Purchased Assets;

xi.	all rights of the Company under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors, pertaining to any Purchased Assets;

xii.	all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property; and

xiii.	all other tangible or intangible assets (whether or not listed on a schedule hereto referencing a specific category of assets) relating to the ~~Purchased Intellectual Property~~PurchasedAssets, other than Excluded Assets.

Notwithstanding the foregoing, the transfer of the Purchased Assets hereunder shall not include the assumption of any Liability related to the Purchased Assets that is not expressly assumed by Purchaser pursuant to Section 2.3(a) hereof.

(c)	At any time at or prior to Closing, Purchaser may (i) remove from Schedule 1.1(c) any Contract to which the Company is a party or (ii) designate any Purchased Asset as an Excluded Asset by giving reasonably detailed written notice thereof to Seller.  Notwithstanding any other provision hereof, the Liabilities of Seller under or related to any such Contract or additional Excluded Asset under this Section 2.1(c) will constitute Excluded Liabilities.

2.2	Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.  For all purposes of and under this Agreement, the term "Excluded Assets" shall mean:

(a)	cash and cash equivalents or similar type investments, bank accounts, certificates of deposit, Treasury bills and other marketable securities, except to the extent that any such assets are derived from the disposition by Seller of Purchased Assets after the date hereof;

(b)	except to the extent set forth in Section 2.1(b)(x), all claims and causes of action which Seller or the Company may have against any third Person, including against the Company's or its Subsidiary's officers, directors, or other employees, and all rights of indemnity, warranty rights, rights of contribution, rights of refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, ~~possessed by the Company, in each case not directly related to Purchased Assets or with respect~~or that relate to ~~the~~ Excluded Liabilities~~, and (ii) all claims and causes of action against the Company's or its Subsidiary's officers, directors, or other employees, except as set forth in Section 2.1(b)(x)~~;

9

(c)      any and all rights of Seller under this Agreement;

(d)      any and all Avoidance Actions; provided, however, that the Seller shall not pursue any Avoidance Action, (i) which, if brought and/or successfully completed, would result in a claim for additional cure payments, and (ii) against Purchaser arising from that certain transfer of $68,560 by the Company to Buyer on or about August 5, 2009;

(e)      except to the extent set forth in Section 2.1(b)(ix), any and all rights under any Contracts not set forth on Schedule 1.1(c) except for any Purchased Intellectual Property derived therefrom (including in particular in relation to any licenses or other rights that survive the termination or expiration of such Contracts) and other transferable rights derived therefrom, including as set forth in Section 2.1(b)(x);

(f)      any shares of capital stock or other equity interest of or in the Company or its Subsidiary or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of or in the Company or its Subsidiary, except in either case to the extent that the transfer of stock or other equity interest in the Subsidiary is necessary to convey good title to any Purchased Assets;

(g)      any minute books, stock ledgers, corporate seals and stock certificates of the Company or its Subsidiary, and other similar books and records that the Company or its Subsidiary are required by Law to retain, including Tax Returns, financial statements and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets;

(h)      subject to Section 2.2(e), any asset of Seller designated by Purchaser as an Excluded Asset pursuant to Section 2.1(c) hereof;

(i)      subject to Section 2.6 and Section 2.2(e), any Purchased Contract or Permit that requires as a matter of law under 11 U.S.C. §365(c) the consent of a third party to be assumed and assigned hereunder (as described in Section 2.6 hereof) as to which, by the Closing Date, such consent has not been obtained, provided, however, that at Purchaser's written election made at or prior to the Closing Date, the time period contemplated hereunder may be extended for a 60 days after the Closing Date to enable Seller and Purchaser to obtain such consent;

(j)      any records, documents or other information relating to current or former employees of the Company or its Subsidiary and any materials containing information about employees, disclosure of which would violate an employee's reasonable expectation of privacy;

(k)      accounts receivable other than arising under any Contract that is a Purchased Contract;

(l)      all insurance policies and rights to proceeds thereof, including, without limitation, all rights under director and officer (or similar) insurance policies, maintained by the Company or its Subsidiary;

(m)      any documents or other materials which are subject to attorney-client or other privilege; and

(n)      all computer servers, provided, however, Seller shall make such servers available to Purchaser at Closing and for 60 days following Closing to the extent necessary for Purchaser to download any electronic data relating to the Purchased Assets; and.

(o)      Any (x) Equipment or (y) inventory or raw materials listed on Schedules 2.1(B)(I) and (III) that may be designated by Seller and which shall be the subject of a notice of abandonment filed in the Bankruptcy Case pursuant to 11 U.S.C. § 554(a) and which abandonment shall have become effective more than three (3) Business Days prior to the Closing Date if Buyer has not terminated this Agreement as provided in Section 4.4(j) hereof.

2.3      Assumption of Liabilities.   On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, only the following Liabilities (without duplication) existing as of immediately prior to the Closing (collectively, the "Assumed Liabilities") and no others:

(a)      all Liabilities of the Company first arising under, on account of, and directly related to the Purchased Assets that arise after the Closing Date; provided, that a Liability shall be deemed to arise after the Closing Date exclusive of any Cure Amounts (as defined below) only to the extent that the particular events, facts, or circumstances constituting the grounds for such Liability first occur after the Closing Date.

2.4      Excluded Liabilities.   Purchaser shall not assume and shall be deemed not to have assumed, and, subject to applicable bankruptcy and non-bankruptcy law, the Company and the Subsidiary each shall remain liable with respect to their respective Liabilities other than the Assumed Liabilities (collectively, the "Excluded Liabilities").

2.5      Purchased Contracts.   At Closing and pursuant to section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser the Purchased Contracts.  The cure amounts, as determined by the Bankruptcy Court, if any (the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts, shall be paid by Purchaser provided that Purchaser may elect not to close the transaction pursuant to Section 9.1(d) of this Agreement, or to remove such Contract as a Purchased Contract pursuant to Section 2.1(c), if Cure Amounts exceed $20,000 unless paid by Seller, in its sole discretion, at the same time as Purchaser would have been obligated to pay the same.

2.6      Non-Assignment of Assets.   [Exclusive of Purchased Contracts,] notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof (and such requirement, license or permit is not overridden by the Bankruptcy Laws or by an order of the Bankruptcy Court, which

Seller agrees to reasonably cooperate with Purchaser to seek to obtain) or in any way adversely affect the rights of Purchaser thereunder and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required or shall have otherwise approved such assignment by Seller to Purchaser.  In such event, Seller will reasonably cooperate with Purchaser if Purchaser requests the transfer of such a Purchased Asset, including Seller seeking to obtain the Necessary Consent or an order finding that such is unnecessary with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser.  Purchaser will promptly reimburse Seller for any out-of-pocket expenses, not including legal fees, incurred by Seller in order to comply with the preceding sentence of this Section ~~2.6~~ 2.6, but shall not be required to increase the Cash Consideration to acquire such Purchased Asset.  Nothing in this Section 2.6 shall be deemed to prevent Purchaser after Closing from asserting any rights over any asset it believes to be a Purchased Asset.

2.7    Further Conveyances.

(a)    From time to time following the Closing, subject only to Bankruptcy Court Approval where deemed appropriate by Seller, Seller and Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to transfer, convey, and assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, Permits, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby, including as provided for in Section 2.6 hereof.

(b)    Except to the extent that Seller shall have obligated itself elsewhere in this Agreement to incur such expenses, Purchaser will promptly reimburse Seller for any out-of-pocket expenses, not including legal fees, incurred by Seller in order to comply with this Section 2.7.

ARTICLE III

CONSIDERATION

3.1    Consideration.  Consideration (the "Purchase Price") for the Purchased Assets shall be comprised of the Cash Consideration ~~(inclusive of the Deposit Amount defined below)~~ and the Assumed Liabilities.  Subject to the satisfaction or waiver of the conditions set forth herein, on the Closing Date, Purchaser shall pay to Seller the Cash Consideration, less the Deposit Amount.  Any cash required to be paid at the Closing will be paid by wire transfer of immediately available funds to an account or accounts specified by the recipient thereof.  In addition, Buyer and any Affiliates shall waive the right to assert any administrative expense claim in the Bankruptcy Case of the Company.  Buyer expressly does not waive and reserves all rights with respect to the general unsecured claims filed in the Bankruptcy Case and rights of set off asserted therein.

3.2    Purchase Price Deposit.  Purchaser shall deposit the sum of $~~40,000.00~~47,500.00 by wire transfer of immediately available funds (the "Deposit Amount") with an account designated by Seller ~~by the end of the Business Day immediately following the date of execution~~

~~of this Agreement~~, which Deposit Amount shall be delivered to either Purchaser or Seller as follows or as otherwise provided in the Bidding Procedures Order:

(a)    if the Closing occurs, to Seller, on the Closing Date;

(b)    if Seller closes any Competing Transaction, to Purchaser, no later than three Business Days following the date of closing;

(c)    if Purchaser is selected as the winning bidder, but the Closing does not occur because Purchaser materially breaches its obligations under this Agreement, to Seller to secure such damages to which Seller may be entitled;

(d)    if Purchaser is selected as the winning bidder or a Back-Up Bidder, but the Closing does not occur because the Sale Order does not include findings that Purchaser has demonstrated adequate assurance of future performance with respect to the Purchased Contracts, if any, to the extent contemplated by section 365 of the Bankruptcy Code, to Seller to ~~secured~~secure such damages to which Seller may be entitled; and

(e)    in any other circumstance, to Purchaser, no later than two Business Days after the earlier of (i) the termination or expiration of this Agreement unless as the result of a material breach of its obligations under this Agreement by Purchaser, or (ii) the date on which performance hereunder becomes impossible for any party.

Nothing in this Section 3.2 shall in any way limit Seller's rights and remedies to seek specific performance or to seek damages in excess of the Deposit Amount if the Closing does not occur because Purchaser materially breaches its obligations under this Agreement.

ARTICLE IV

CLOSING AND TERMINATION

4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Craig and Macauley Professional Corporation located at 600 Atlantic Avenue, Boston, Massachusetts (or at such other place as the parties may designate in writing) at 10:00 a.m. (Boston, Massachusetts time) on the third Business Day following the day on which the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) (the "Closing Conditions") are satisfied or waived, unless another time or date, or both, are agreed to in writing by the parties hereto or unless Purchaser is a Back-Up Bidder.  The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

4.2    Deliveries by Seller.  At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed "as is, where is" bill of sale with no representations or warranties of any kind express or implied, in a form to be reasonably agreed upon by the parties hereto;

13

(b)     one or more duly executed "as is, where is" assignment and assumption agreements in a form to be reasonably agreed upon by the parties hereto and duly executed assignments of the U.S. and foreign patent and trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office, and any equivalent foreign authority or authorities responsible for trademark and patent matters;

(c)     the ~~Trustee~~Seller's certificate required to be delivered pursuant to Sections 9.1(a) and 9.1(b) ; and

(d)     all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser as contemplated by this Agreement.

Notwithstanding any provision to the contrary in this Agreement, Purchaser hereby acknowledges that Seller is not required to deliver physical possession of any asset at Closing other than records currently in the possession of the Seller and, with respect to electronic data of the Company, Seller shall make available for download by Purchaser all electronic data of the Company relating to Purchased Assets. Notwithstanding the foregoing, Seller shall reasonably cooperate with Purchaser, and shall cause her representatives to reasonably cooperate, in identifying the location of all physical Purchased Assets and, to the extent necessary or appropriate, in facilitating the pick-up and/or delivery of such assets by Purchaser or its agents.

4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller:

(a)     the balance of the consideration as specified in Section 3.1 hereof;

(b)     one or more duly executed assignment and assumption agreements in a form to be agreed upon by the parties;

(c)     the officer's certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(b);  and

(d)     such other documents, instruments and certificates as Seller may reasonably request.

4.4     Termination of Agreement.  This Agreement may be terminated (or shall be terminated, as the case may be) prior to the Closing as follows:

(a)     by Purchaser or Seller, if ~~either the Bankruptcy Court has not entered the Bidding Procedures Order within 45 days from the date of this Agreement, or~~ the Closing shall not have occurred on or before the close of business 120 calendar days after the date of this Agreement (the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to the fault of a party hereto to perform its obligations under this Agreement, then the breaching party may not terminate this Agreement pursuant to this Section 4.4(a);

~~(b)      by Purchaser within three Business Days after entry of the Bidding Procedures Order by the Bankruptcy Court if the Bidding Procedures Order so entered is not substantially in the form attached hereto as Exhibit A, including, without limitation, if the Bidding Procedures Order does not provide for the payment of the Expense Reimbursement Amount;~~

(b)      ~~(c)~~ by mutual written consent of Seller and Purchaser;

(c)      ~~(d)~~ by Purchaser, if any condition to the obligations of Purchaser set forth in Sections 9.1 and 9.3, other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, has become incapable of fulfillment prior to the Termination Date and such condition is not waived by Purchaser;

(d)      ~~(e)~~ by Seller, if any condition to the obligations of Seller set forth in Sections 9.2 and 9.3, other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, has become incapable of fulfillment prior to the Termination Date and such condition is not waived by Seller;

(e)      ~~(f)~~ by Purchaser, if there shall be a breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.1 or 9.3 and which breach has not been cured by the earlier of (i) 10 Business Days after the giving of written notice by Purchaser to Seller of such breach and (ii) the Termination Date;

(f)      ~~(g)~~ by Seller, if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.2 or 9.3 and which breach has not been cured by the earlier of (i) 10 Business Days after the giving of written notice by Seller to Purchaser of such breach and (ii) the Termination Date;

(g)      ~~(h)~~ by Seller or Purchaser if there shall be in effect a final non-appealable Order of a Governmental Body (not including an arbitrator) of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence); and

(h)      ~~(i)~~ automatically, if Seller closes any one or more Competing Transactions~~; (j)      by Purchaser, within three (3) Business Days of the date that Seller gives notice to Purchaser pursuant to Section 2.2(o) of the effectiveness under 11 U.S.C. § 554(a) of a notice of abandonment by Seller~~.

For the avoidance of doubt, Purchaser acknowledges and agrees that it shall not be entitled to terminate this Agreement solely because any bidder other than Purchaser has prevailed at an auction held pursuant to the Bidding Procedures Order.

4.5      Procedure Upon Termination.  In the event of termination pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties (including by Seller in the event Seller closes any Competing Transaction), and this Agreement shall terminate without further action by Purchaser or Seller.

4.6    Effect of Termination.  In the event that this Agreement is terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination; provided, however, that the obligations of the parties set forth in Section 3.2 (*Purchase Price Deposit*), Section 7.3 (*Expense Reimbursement*), Section 8.4 (*Confidentiality*) and the provisions of Article XI (*Miscellaneous*) hereof shall survive any such termination and shall be enforceable hereunder; provided further, however, that, subject to Section 11.3, nothing in this Section 4.6 shall be deemed to release any party from Liability for any breach of its obligations under this Agreement, or from any other Liability that it may incur as a result of its actions.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser on the date hereof, and on the Closing Date, that:

5.1    Authorization of Agreement.  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Order and such other authorization as is required by the Bankruptcy Court, Seller has the requisite corporate power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder, including any transfers that must be effected by the Company's Subsidiary.  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Order and such other authorization as is required by the Bankruptcy Court, the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby to which Seller is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement and each other agreement, document or instrument contemplated hereby to which Seller is a party have been duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto, the entry and effectiveness of the Sale Order, and, with respect to Seller's obligations under Section 7.3, the entry and effectiveness of the Bidding Procedures Order) this Agreement and each other agreement, document or instrument contemplated hereby to which it or its Subsidiary is a party constitute legal, valid and binding obligations of Seller  or Subsidiary and enforceable against it or Subsidiary in accordance with the respective terms of this Agreement or each such other agreement, document or instrument, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general prohibitions of equity.

5.2    Consents of Third Parties.  Except as set forth on Schedule 5.2, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person is required on the part of Seller or Subsidiary in connection with the execution, delivery and performance of this Agreement and each other agreement, document or instrument contemplated hereby, the compliance by Seller or Subsidiary with any of the provisions hereof or thereof, the transfer of the Purchased Assets to Purchaser or the consummation of the transactions contemplated hereby or thereby or the taking by Seller or Subsidiary of any other

16

action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the entry of the Bidding Procedures Order with respect to Seller's obligations under Section 7.3, and (iii and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect. Purchaser understands and acknowledges that Purchaser will be solely responsible for obtaining any required authorizations, Permits, and/or approvals from any Governmental Body, including the FDA, to use the Purchased Assets in clinical trials, or to otherwise possess or manufacture any controlled substances, and that the Purchaser may not rely on any authorizations or approvals applied for or obtained by the Company from any Governmental Body except to the extent that such reliance is authorized by applicable Law.

5.3    Title to Assets; Intellectual Property. The Purchased Intellectual Property is, and each Purchased Contract is, valid, subsisting, and enforceable. Seller has made and will continue to make the payments necessary to maintain the material rights of Seller in the Purchased Intellectual Property between the date of this Agreement and until the Closing.

5.4    Subsidiary.  The Subsidiary does not hold title to nor claim any interest in any of the Purchased Assets to be transferred hereunder.  No Purchased Asset, to be transferred hereunder, shall require the consent of, or action by, the Subsidiary.

5.5    Name Change; Reincorporation.  To the best of the Seller's knowledge, the Company was originally organized in 1992 as a Massachusetts corporation.  In May 2004, the Company reincorporated as a Delaware corporation via a merger with a newly established Delaware corporation under the name of Altus Biologics Inc.  In May 2004, the Company changed its corporate name to "Altus Pharmaceuticals, Inc."  All Purchased Intellectual Property, Purchased Contracts, and other contracts, agreements and property forming part of the Purchased Assets to be transferred hereunder that were entered, created or acquired by the Company under its prior corporate name and/or prior to the Company's reincorporation in Delaware are the legal, valid and binding property and contracts of the Company, enforceable by and/or against the Company, and to the Company's best knowledge, each other party thereto, in accordance with their respective terms.

5.6    Contracts.    Seller has furnished Purchaser with, or made available to Purchaser, lists of or true and complete copies of all material contracts, licenses, agreements and instruments (including, without limitation, all amendments and other modifications thereof and all waivers of any provisions thereof) respecting the Purchased Intellectual Property or any of it.

5.7    Non-Infringement.    To the best knowledge of Seller, none of the Purchased Intellectual Property violates or infringes any patent, copyright, trademark, service mark, trade secret or other proprietary right of any Person.  Seller has received no notice from any Person alleging that any of the Purchased Intellectual Property violates or infringes any patent, copyright, trademark, service mark, trade secret or other proprietary right of any Person.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1    <u>Organization and Good Standing</u>.  Purchaser is an entity duly organized, validly existing and in good standing under the laws of the ~~Commonwealth~~State of ~~Massachusetts~~Delaware, and has the requisite power and authority to carry on its business as now conducted.

6.2    <u>Authorization of Agreement</u>.  Purchaser has the requisite power and authority to execute, deliver and perform this Agreement and each other agreement, document or instrument contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and each such other agreement, document or instrument contemplated hereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby to which it is a party has been duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each such other agreement, document or instrument contemplated hereby constitute legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally.

6.3    <u>Conflicts; Consents of Third Parties</u>.

(a)    The execution and delivery by Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the organizational documents and by-laws or comparable organizational and managerial documents of Purchaser; (ii) any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound; (iii) any Order of any Governmental Body applicable to Purchaser or any of the properties or assets of Purchaser; or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the

18

consummation of the transactions contemplated hereby or thereby, the taking by Purchaser of any other action contemplated hereby or thereby, except for such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make, would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.4     Litigation.   There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.5     Financial Capability.   Purchaser now has or has obtained a commitment for, and will have at the Closing, sufficient funds available to pay up to the amount of the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement.  Purchaser acknowledges and agrees that this transaction is not contingent on the receipt of any financing by Purchaser.

6.6     Brokers/Financial Advisors.   No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Purchaser or Seller in respect thereof.

6.7     Investigation; No Additional Representations; No Reliance.     Purchaser acknowledges and agrees that Seller has not, either directly or through an advisor or other agent or representative, made and shall be deemed not to have made, nor has Purchaser relied on, any representation, warranty, covenant or agreement, express or implied, with respect to the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities, the Company's business relating to any of the foregoing, or the transactions contemplated hereby, other than those explicitly set forth in Article V of this Agreement.  Except with respect to claims based on "fraud" or "fraudulent misrepresentation", as such terms are defined under applicable law, Seller shall not have any personal or individual Liability of any nature to Purchaser with respect to any breach of any representation, warranty, obligation, covenant or agreement set forth in, or any other breach of, this Agreement.  Without limiting the generality of the foregoing, the Seller is not, except as explicitly set forth in Article V hereof, making any representation or warranty with respect to any information, documents or materials furnished to Purchaser relating to the Purchased Assets, the Company or its Subsidiary.

ARTICLE VII

BANKRUPTCY COURT MATTERS

7.1     Bankruptcy Court Filings.   ~~As soon as practicable after the date hereof, Seller shall file with the Bankruptcy Court a motion seeking entry of the Sale Order and the Bidding Procedures Order (the "Sale Motion").   Thereafter, subject~~Subject to Section 7.2, all parties hereto shall use their commercially reasonable efforts to have the Bankruptcy Court enter the Sale Order ~~and the Bidding Procedures Order~~.  Seller shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance or approving

19

notice as given) with all requirements under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the Sale ~~Order and the Bidding Procedures~~ Order, including serving on all required Persons in the Bankruptcy Case, including (i) all Persons who are known to possess or assert a Lien against any of the Purchased Assets, (ii) all parties to Purchased Contracts, (iii) the Governmental Bodies listed in <u>Schedule 7.1</u> and (iv) all other Persons, including each of Seller's other creditors, required by any order of the Bankruptcy Court (including any omnibus notice or case management order entered in the Bankruptcy Case), notice of the Sale Motion, the hearing to approve the Sale Motion and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure, the Bidding Procedures Order or other orders of the Bankruptcy Court, including any applicable local rules of the Bankruptcy Court.  Purchaser shall provide such information and assistance as are reasonably requested by Seller to assist Seller in obtaining a finding by the Bankruptcy Court that Purchaser is deemed to have purchased the Purchased Assets in good faith pursuant to section 363(m) of the Bankruptcy Code and that it has the necessary qualifications to show adequate assurance of future performance with respect to the Purchased Contracts as required by section 365 of the Bankruptcy Code.  In the event the Sale Order ~~or the Bidding Procedures Order~~ is appealed, subject to rights otherwise arising from this Agreement, the parties hereto shall cooperate in taking such steps to prosecute diligently such appeal and use their commercially reasonable efforts to defend such appeal.

      7.2    <u>Competing Transactions</u>.

      (a)    Until entry of the Sale Order, and in any event subject to the Bidding Procedures Order, or if Purchaser is designated as Back Up Bidder, until a Closing of a Competing Transaction (the "<u>Solicitation Period</u>"), Seller will be permitted to cause its respective representatives and Affiliates to initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of all or a portion of the Purchased Assets to a purchaser or purchasers other than Purchaser or effecting any other transaction the consummation of which would be substantially inconsistent with the transactions herein contemplated (including the "stalking horse" transaction identified in the Bidding Procedures Order) (a "<u>Competing Transaction</u>").  After the Solicitation Period, and in any event subject to and in accordance with the Bidding Procedures Order, Seller will not participate in any discussions with, or furnish any information to, any Person with respect to any Competing Transaction regardless of the terms thereof.

      (b)    Except during the Solicitation Period and in accordance with the Bidding Procedures, Seller will not (i) discuss, encourage, facilitate, negotiate, undertake, initiate, solicit, authorize, propose or enter into a Competing Transaction or (ii) furnish or cause to be furnished to any Person any information covering the business, properties or assets of Seller in connection with a Competing Transaction.

~~7.3    Expense Reimbursement.  Purchaser shall be entitled to reimbursement from Seller of an amount equal to the Expense Reimbursement Amount if Seller consummates any Competing Transaction.  Seller acknowledges and agrees that (i) the payment of the Expense Reimbursement Amount is an integral part of the transactions contemplated by this Agreement,~~

~~(ii) in the absence of Seller's obligations to make these payments, Purchaser would not have entered into this Agreement and (iii) time is of the essence with respect to the payment of the Expense Reimbursement Amount. The Expense Reimbursement Amount and any other obligations of Seller hereunder or under the Bidding Procedures Order (1) shall constitute administrative expenses allowable under section 503(b)(1) of the Bankruptcy Code; provided, that to the extent a Competing Transaction is consummated, shall be paid directly to Purchaser, upon the closing of such Competing Transaction, from the escrow deposit of the purchaser(s) in such Competing Transaction, or by Seller, if no or an inadequate escrow deposit is in place.~~

7.3   ~~7.4~~ Back-Up Bidder. After an auction as contemplated by the Bidding Procedures Order, Seller may seek approval by the Bankruptcy Court of a Competing Transaction, but may also seek approval of a sale of the Purchased Assets pursuant to this Agreement, as may be amended, to Purchaser if Seller elects not to close a Competing Transaction and instead elects to sell to Purchaser as a back-up bidder ("Back-Up Bidder"). If and only if Seller satisfies the conditions set forth in Article IX of this Agreement prior to 45 days after entry of the Sale Order and within the same time period elects to sell to Purchaser as Back-Up Bidder, Purchaser shall be obligated to close the transactions contemplated by this Agreement.

ARTICLE VIII

COVENANTS

8.1   Access to Information. Seller agrees that, prior to the Closing Date, Purchaser, at its sole cost and expense, shall be entitled, following notice from Purchaser to Seller in accordance with Section 11.7, to make reasonable investigation of the Purchased Assets and such examination of the books and records of the Company and its Subsidiary and the Purchased Assets and the Assumed Liabilities as it reasonably requests to verify the representations and warranties provided by Seller herein, provided, however, that so long as Seller reasonably provides sufficient information related thereto exclusive of any additional information regarding Intellectual Property relating to Protein A, Purchaser shall not be entitled to examine certain information regarding the Company, which Seller deems to be highly sensitive and the disclosure of which could reduce the value of the Purchased Assets, until after the Closing, at which time such information will be provided to Purchaser to the extent in the possession, custody or control of the Seller. Any such investigation and examination shall be conducted upon reasonable advance notice and under reasonable circumstances.

8.2   Further Assurances. Prior to the Closing and subject to the other provisions of this Agreement, each of Purchaser and Seller shall use its or her commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

8.3   Preservation of Records. Purchaser shall preserve and keep the records acquired by it relating to the Purchased Assets for a period of three years after the Closing and shall make such records available for inspection by Seller or her representatives at reasonable times and places (and copying by Seller, at a cost of $0.08 per page to be paid by Seller), for use in

connection with, among other things, Seller's administration of the bankruptcy estate of the Company.  In the event Purchaser wishes to destroy such records after that time, it shall first give Seller 60 calendar days prior written notice and Seller shall have the right at her option and expense, upon prior written notice given to Purchaser within such 60 day period, to take possession of the records or some of them within 60 calendar days after the date of such notice.

8.4     Confidentiality.

(a)     Purchaser and Seller agree to maintain (and cause to be maintained) as confidential all Confidential Information, except as required by Law; provided, however, that each party may reveal Confidential Information ~~tothe~~to the extent permitted in separate confidentiality agreements executed by Seller and ~~Buyer~~Purchaser or ~~Buyer~~Purchaser's representatives.  Without limiting the generality of the foregoing, prior to the Closing , no public release or announcement concerning the proposed transactions shall be issued or made by or on behalf of any party hereto without the prior written consent of the other party hereto except in pleadings filed with the Bankruptcy Court.  In the event that any party hereto is required by Law to disclose any Confidential Information (other than as a result of the Bankruptcy Case, including for the purposes of a Competing Transaction), or is required to make any public release or announcement concerning the proposed transactions, the disclosing party shall promptly notify the non-disclosing party in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and the non-disclosing party shall be afforded the opportunity (prior to disclosure) to comment on the necessity for and the contents of the proposed release or announcement, and the disclosing party shall cooperate with the non-disclosing party to preserve the confidentiality of such information consistent with applicable Law.  Nothing herein shall be construed to limit Purchaser's use of Confidential Information relating to the Purchased Assets following the Closing.   This Section supplements the confidentiality agreements already entered into by Seller and Purchaser or Purchaser's representatives which remain in effect and enforceable in accordance with their terms.

(b)     "Confidential Information" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the proposed transaction, or that relates to the business, products, services or research or development of Seller or its respective suppliers, distributors, customers, independent contractors or other business relations.  The term "Confidential Information" will not, however, include information which (i) is or becomes publicly available other than as a result of a disclosure in breach of this Agreement, (ii) is or becomes available on a nonconfidential basis from a source which, to the disclosing party's knowledge, is not prohibited from disclosing such information by a legal, contractual or fiduciary obligation to non-disclosing party or (iii) has been independently acquired or developed by the non-disclosing party.

ARTICLE IX

CONDITIONS TO CLOSING

9.1     Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or

prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)      The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Purchaser shall have received a certificate in form and substance satisfactory to it, signed by Seller (acting in her capacity as Trustee), dated the Closing Date, to the foregoing effect;

(b)      Seller shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed or complied with by her prior to the Closing Date, and Purchaser shall have received a certificate in form and substance satisfactory to it, signed by Seller (acting in her capacity as Trustee), dated the Closing Date, to the forgoing effect;

(c)      Seller shall not have transferred, abandoned or sold any of the Purchased Assets during the period between the date of this Agreement and the Closing Date;

(d)      Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(e)      The aggregate Cure Amounts shall be less than or equal to $20,000, or if greater, Seller shall have agreed to pay, and be able to pay, all Cure Amounts in excess of $20,000 by a date satisfactory to Purchaser and consistent with the Purchased Assets; and

(f)      The Sale Order shall approve the assumption and assignment to Purchaser of the Purchased Contracts.

9.2      Conditions Precedent to Obligations of Seller.   The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)      The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)      Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(c)      Purchaser shall have delivered to Seller all of the items set forth in Section 4.3; and

23

(d)    The aggregate value of all liens, other than Permitted Encumbrances, asserted against the Purchased Assets shall be less than $40,000.

9.3    <u>Conditions Precedent to Obligations of Purchaser and Seller</u>.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)    the Bankruptcy Court shall have entered the Sale Order, substantially in the form attached hereto as <u>Exhibit ~~B~~A</u>, and such Sale Order shall have become a Final Order, provided, however, that in this instance Purchaser alone may waive the condition that such Order be a Final Order.

9.4    <u>Frustration of Closing Conditions</u>.  No party may rely on the failure of any condition set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

ARTICLE X

TAXES/PRORATIONS/FEES

10.1    <u>Transfer Taxes</u>.  Purchaser shall be liable for all sales, use, stamp and other transfer Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement, including, without limitation, the costs of transferring and filing Patents, (collectively, "<u>Transfer Taxes</u>").  Seller and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes and shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

10.2    <u>Purchase Price Allocation</u>.  Seller and Purchaser shall allocate the Purchase Price among the Purchased Assets of Seller in accordance with a statement (the "<u>Allocation Statement</u>") provided by Purchaser to Seller as soon as practicable after the Closing (and after providing Seller with an opportunity to review and comment on a draft statement)**,** which statement shall be prepared in accordance with section 1060 of the Code.  Purchaser and Seller shall file all Tax Returns (including Form 8594) consistent with, and shall take no tax position inconsistent with the Allocation Statement provided that the Allocation Statement is reasonable.

10.3    <u>Cooperation and Audits</u>.  Purchaser, its Affiliates and Seller shall cooperate fully with each other regarding tax matters (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Agreement until the expiration of the applicable

statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such taxes.

10.4   <u>Withholding Taxes</u>.   Notwithstanding anything herein to the contrary, to the extent required by Law, Purchaser shall be entitled to withhold any and all amounts from the Purchase Price equal to any withholding Tax owed to any Tax Authority as a result of the transactions contemplated by this Agreement.   For avoidance of doubt, any amounts withheld hereunder shall be treated as having been paid to Seller.

10.5   <u>Prorations of Certain Taxes</u>.   Seller shall bear all property and ad valorem tax Liability with respect to the Purchased Assets if the lien or assessment date arises prior to the Closing Date irrespective of the reporting and payment dates of such taxes.   All other personal property taxes, or ad valorem obligations and similar recurring taxes and fees on the Purchased Assets for taxable periods beginning before, and ending after, the Closing Date, shall be prorated between Purchaser and Seller as of the Closing Date.   Seller shall be responsible for all such taxes and fees on the Purchased Assets accruing during any period up to and including the Closing Date.   Purchaser shall be responsible for all such taxes and fees on the Purchased Assets accruing during any period after the Closing Date.   With respect to Taxes described in this <u>Section 10.5</u>, Seller shall timely file all Tax Returns due before the Closing Date with respect to such Taxes and Purchaser shall prepare and timely file all Tax Returns due after the Closing Date with respect to such Taxes.   If one party remits to the appropriate Tax Authority payment for Taxes, which are subject to proration under this <u>Section 10.5</u> and such payment includes the other party's share of such Taxes, such other party shall promptly reimburse the remitting party for its share of such Taxes.

ARTICLE XI

MISCELLANEOUS

11.1   <u>No Survival of Representations and Warranties</u>.   The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties nor any of their members, officers, directors, equity holders, representatives, employees, advisors or agents shall have any Liability to each other after the Closing for any breach thereof.   The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder.   Any obligations of Seller shall be <u>administrative expense</u> obligations of the Chapter 7 estate <u>pursuant to 11 U.S.C. §503(b)(1)</u>, and not the Trustee individually, which shall survive as long as the Bankruptcy Case remains open and shall be enforced by appropriate application to the Bankruptcy Court.

11.2   <u>Expenses</u>.   Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby.

11.3   <u>Submission to Jurisdiction; Consent to Service of Process</u>.

25

(a)        Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 11.7</u> hereof.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in ~~such court~~<u>the Bankruptcy Court</u> or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 11.7</u>.

11.4    <u>Waiver of Right to Trial by Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

11.5    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the schedules and exhibits hereto) and the agreements and documents referenced herein represent the entire understanding and agreement between the parties hereto with respect to the subject matter herein, and fully supersedes any and all prior agreements or understandings, both written and oral, between the parties hereto pertaining to the subject matter herein (including in respect of non-disclosure and confidentiality).  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

11.6    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts applicable to contracts made and performed in such State.

11.7  <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

> Lynne F. Riley, Chapter 7 Trustee
> Bankruptcy Estate of
> Altus Pharmaceuticals Inc.
> c/o Altman Riley Esher LLP
> 100 Franklin Street
> Boston, MA 02110
> Facsimile: (617) 399-7410

> > With a copy to:

> > > Craig and Macauley Professional Corporation
> > > Federal Reserve Plaza
> > > 600 Atlantic Avenue
> > > Boston, Massachusetts 02210
> > > Facsimile:  (617) 742-1788
> > > Attention:  Christopher J. Panos, Esquire

If to Purchaser, to:

> ~~Milk 401 Partners, LLC~~
> ~~c/o JDJ Resources~~
> ~~31 Milk Street, Suite401~~
> ~~Boston, Massachusetts 02109~~
> Althea Technologies, Inc.
> 11040 Roselle St.
> San Diego, California 92121
> Facsimile: (~~617~~858) ~~646-4501~~882-0133
> Attention: ~~James M. Kittner~~William G. Kachioff

> > With a copy to:

> > > ~~Riemer & Braunstein LLP~~
> > > ~~Three Center Plaza~~
> > > ~~Boston, Massachusetts 02108~~
> > > Cooley Godward Kronish LLP
> > > 101 California Street, 5th Floor
> > > San Francisco, California 94111

27

Facsimile:  (617415)  692-3466693-2222
Attention:  Guy B. MossRobert L. Eisenbach III, Esquire

11.8    Severability.   In case any one or more of the provisions contained in this Agreement shall be invalid or unenforceable in any jurisdiction, the validity and enforceability of all remaining provisions contained herein shall not in any way be affected or impaired thereby; and the invalid or unenforceable provisions shall be interpreted and applied so as to produce as near as may be the result intended by the parties.

11.9    Assignment.   This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns (including any trustee appointed in respect of Seller under the Bankruptcy Code).  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other and any attempted assignment without the required consents shall be void, provided that Purchaser may assign some or all of its rights and obligations hereunder to one or more of its Affiliates.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations prior to the Closing, but after which the assignee shall become solely responsible for any obligations assigned to it.  Upon any such permitted assignment, the references in this Agreement to Seller or Purchaser shall also apply to any such assignee unless the context otherwise requires.

11.10    No Third Party Beneficiaries.   This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations, claims, or causes of action under or by reason of this Agreement.

11.11    Non-Recourse.   This Agreement may only be enforced against, and any claims that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto.  In the case of the Seller, Lynne F. Riley is acting only as a duly appointed representative of the Chapter 7 bankruptcy estate; no claim may be asserted against her in her individual capacity.

11.12    Counterparts.   This Agreement may be executed in one or more original or facsimile counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE TO ALL ASSET APA]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

<u>PURCHASER</u>:

~~MILK 401 PARTNERS, LLC~~

ALTHEA TECHNOLOGIES, INC.

By:_____

    Name:
    Title:

<u>SELLER</u>:

BANKRUPTCY ESTATE OF
ALTUS PHARMACEUTICALS INC.

By:_____
    Lynne F. Riley, as Chapter 7 Trustee
    and not  individually

## LIST OF SCHEDULES AND EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| ~~Exhibit A~~ | ~~Form of Bidding Procedures Order~~ |
| ~~Exhibit B~~ | ~~Form of Sale Order~~ |

| EXHIBIT | DESCRIPTION |
|---|---|
| Exhibit A | Form of Sale Order |

| SCHEDULE | DESCRIPTION |
|---|---|
| Schedule 1.1(b) | Liens |
| Schedule 1.1(c) | Purchased Contracts |
| Schedule 1.1(d) | Registrations |
| Schedule 2.1(b)(i) | Inventory and Raw Materials |
| Schedule 2.1(b)(iii) | Equipment |
| Schedule 2.1(b)(iv) | Patents |
| Schedule 5.2(a) | Consents, approvals or authorizations |
| Schedule 7.1 | Service List |

**<u>EXHIBIT A</u>**
**<u>Form of Bidding Procedures Order</u>**

**EXHIBIT B**
**Form of Sale Order**

## <u>SCHEDULE 1.1(B)</u>
### <u>Liens</u>

Fish and Richardson P.C., 225 Franklin Street, Boston, MA 02110 has asserted in a proof of claim filed in the Bankruptcy Case an attorney's lien in the sum of $4,426.13.

## SCHEDULE 1.1(C)
## Purchased Contracts

Letter Agreement, dated February 20, 2009, by and between Altus Pharmaceuticals, Inc. ("Altus") and Cystic Fibrosis Foundation Therapeutics, Inc. ("CFFT"), regarding the termination of the Strategic Alliance Agreement, dated as of February 22, 2001, by and between Altus and CFFT, as amended by First and Second Amendments, the License Agreement by and between Altus and CFFT, dated as of February 20, 2009, and the transition of Trizytek development and commercialization from Altus to CFFT (the "February Letter Agreement").

License Agreement, dated as of February 20, 2009, by and between Altus and CFFT, and made subject to the February Letter Agreement (the "CFFT License Agreement").

Letter Agreement, dated as of July 2, 2009, by and between Altus, CFFT, and CFFT's sublicensee, Alnara Pharmaceuticals, Inc., and regarding, among other matters, certain amendments to the CFFT License Agreement.

Technology License Agreement, dated as of February 1, 1999, between Vertex Pharmaceuticals, Incorporated, and Altus Biologics, Inc.

## SCHEDULE 1.1(D)
### Registrations

None

## SCHEDULE 2.1(B)(I)
## Inventory and Raw Materials

The following inventory and raw materials located at Althea:

| Item | Quantity |
|------|----------|
| Sandoz rhGH* | 396 grams |
| PolyArginine* | 250 grams |
| Polyglykol 6000* | 150 kilograms |

*Please note that some of this inventory and raw materials may be owned by Althea and it is being sold subject to any such claims.

## SCHEDULE 2.1(B)(III)
### Equipment

The following equipment located at Althea:

- One crystallization skid with crystallization vessel (DSC03283.jpg & DSC05064.jpg)
- One ultrafiltration skid (DSC03287.jpg)  Both skids are shown together in DSC05112.jpg.
- One 200L portable stainless steel buffer tank mfd by ABEC. (no picture available)
- One 100 (or 150)L portable stainless steel buffer tank mfd by Alleghany Bradford (shown on right side in DSC-02939.jpg)
- One product transfer tank (pressure vessel) with pneumatic transfer cart / lift (DSC04191.jpg)
- Controller PC(s) & Julabo chiller in adjacent space (DSC05114.jpg)
- Associated pumps, mixers & equipment (shown throughout photos)
- Misc. spare parts

## SCHEDULE 2.1(B)(IV)
### Patents[1]

**Patents**: 42.794 CL; 906417 DK; 906417 EP; 906417 FR; 69738648.1 DE; 191060 IN; 226892 IN; 906417 IT; 4279351 JP; 97/4325 ZA; 906417 SE; 906417 CH; 906417 GB; 5932212 US; 6042824 US

**Applications**: [P970102139 AR]; [P-971682 ID]; 2007-305136 JP; [98-709554 KR]; [PCT/US97/08526]; [56533 PH]; [86106384 TW]; 9701001855 TH; 923-1997 VE

**Patents**: 2241746 RU; 98/3044 ZA; 6140475 US

**Applications**: [P980101654 AR]; 2286461 CA; 749-1998 CL; 8010903.6 EP; [98915494.3 EP]; [104573.7 HK]; [631CAL98 IN]; [635CAL98 IN]; 2008-148661 JP; [10-544122 JP]; [PI9801495 MY]; [PCT/US98/07287]; [27398 PE]; [I199800820 PH]; 2004118306 RU; [87105465 TW]; 9801001266 TH; [09/631241 US]; [10/760148 US]; [10/337061 US]; 11/312210 US; 11/327010 US; [09/459395 US]; [199800697 VE]

**Patents**:  1009759 DK; 1009759 EP; 1009759 FR; 69839563.8 DE; 1009759 IE; 27900BE/08 IT; 1009759 NL; 98/7378 ZA; ES2306477T3 ES; 1009759 SE; 1009759 CH; 1009759 GB; 6359118 US; 7087728 US; 6500933 US; 6359118 US

**Applications**: [P980104437 AR]; [2141-98 CL]; 8009660.5 EP; [1557/CAL/98 IN]; [1556/CAL/98 IN]; [PI 9804062 MY]; [PCT/US98/16372]; [827 PE]; [1-1998-02304 PH]; [87114096 TW]; 9801003429 TH; [08/926279 US]; [10/047605 US]; [1784-98 VE]

**Patents**: 757991 AU; 228403 IN; 121739 SG; 2000/6023 ZA; 7351798 US; 6541606 US

**Applications**: 2330476 CA; 99920064.5 EP; 01104882.2 HK; 2000-545510 JP; [PCT/US99/09099]; [200006192-9 SG]; [60/083148 US]; 12/609650 US; [12/069696 US]

**Patents**: 2002256971 AU; 217458 IN; 526720 NZ; 101551 SG; 2003/5035 ZA

**Applications**: 2008201480 AU ; 2433353 CA ; 07003574.6 EP ; [01272485.2 EP] ; 07114038.8 HK ; [04102144.7 HK] ; 156618 IL; 2002-571549 JP; 2008-7007422 KR; 2003-7008836 KR; [PCT/US2001/049628]; 10/034950 US; 12/237917 US

**Patents**: 228748 IN; 2357750 RU; 115885 SG; 2005/05305 ZA

**Applications**: 2003303646 AU ; P10317888-9 BR; 2512052 CA ; 0910140060.2 CN ; [80109408.2 CN] ; 5073299 CO; 03808602.1 EP; 06104080.7 HK; 2347/KOLNP/08 IN;

---

[1] Patents and/or patent  applications listed in brackets are abandoned, expired or otherwise inactive.  The two-letter abbreviations following the patent/patent application number indicates the country in which the patent issued/ in which the application was filed.

169394 IL; 2005-508635 JP; 2005-7012348 KR; 2005/007181 MX; 541443 NZ;
[PCT/US2003/041545]; 2005-501231 PH; 200716575-6 SG; [60/517042 US];
[60/437519 US]; 10/749962 US
2007333959 AU; 2672284 CA; 07869230.8 EP; 2307/KOLNP/2009 IN; 2009-541592
JP; [PCT/US2007/087417]; [60/870605 US]; 12/519720 US

**Patents**: 236510 IN; 554885 NZ; 113284 SG; 2005/05306 ZA

**Applications**: 2003300126 AU ; PI0317896-0 BR ; 2512001 CA ; 5073929 CO ;
03800385.1 EP ; 61046909.9 HK ; 169395 IL ; 2004-564910 JP ; 2005-7012346 KR ;
2005/007182 MX ; [541444 NZ] ; 571243 NZ ; [PCT/US2003/041691]; 2005-501232
PH; [60/437775 US]; 11/169956 US

**Applications**: 2006330833 AU; 2634053 CA; 6846055.9 EP; [7136/DELNP/07 IN];
2008-547663 JP; PCT/US2006/049278; [60/735965 US]; 12/158384 US

**Applications**: 2006257787 AU; 2610159 CA; 06773127.3 EP; 2008-516040 JP;
[PCT/US2006/023115]; [60/689468 US]; 11/916858 US

**Applications**: 2007347695 AU; 2659081 CA; 780035792.4 CN; 07873799.6 EP;
419/KOLNP/09 IN; 196777 IL; 2009-523059 JP; [PCT/US2007/075091]; 2009107184
RU; 2009/00704 ZA; [60/834933 US]; [60/854540 US]; 11/833082 US

**Applications**: PCT/US2009/038124; [61/039018 US]

**Applications**:  61/242537

**Patents**: 2002322295 AU; 530700 NZ; 101744 SG

**Applications**: 2451185 CA; 02756275 EP; 05105405.3 HK; 159475 IL; 2003-506470
JP; 573876 NZ; [PCT/US2002/019870]; [60/299989 US]; 10/741861 US

## <u>SCHEDULE 5.2(A)</u>
### <u>Consents, approvals or authorizations</u>

1. Any and all Permits; and
2. Any and all approvals of Foreign Governmental Bodies related to the transfer of the Purchased Assets.

## SCHEDULE 7.1
## Service List

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

1167021 v2/SF

Document comparison done by DeltaView on Monday, March 29, 2010 3:24:09 PM

| Input: | |
|---|---|
| Document 1 | file://S:/BCB Files/CJP Share/Altus Pharmaceuticals (5743-1)/Chapter 7 Sale Transactions/Milk 401 Partners Docs/APA.Execution Copy word.doc |
| Document 2 | file://S:/BCB Files/CJP Share/Altus Pharmaceuticals (5743-1)/Chapter 7 Sale Transactions/Althea APA/Althea-Altus APA 3.25.10 final.doc |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 80 |
| Deletions | 88 |
| Moved from | 4 |
| Moved to | 4 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 176 |